[Cite as *In re T.D.*, 2016-Ohio-7245.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY COUNTY

| | | |
|---|---|---|
| In re: | : | |
| | : | |
| T.D., M.H., M.H. and M.H., Jr. | : | Appellate Case No. 27136 |
| | : | |
| | : | Trial Court Case Nos. JC-2012-8809 |
| | : | JC-2012-8810, JC-2012-8811 and |
| | : | JC-2012-8813 |
| | : | |
| | : | (Juvenile Appeal from |
| | : | Common Pleas Court) |

. . . . . . . . . . .

O P I N I O N

Rendered on the 7th day of October, 2016.

. . . . . . . . . .

MATHIAS H. HECK, JR., by MEAGAN D. WOODALL, Atty. Reg. No. 0093466, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, P.O. Box 972, 301 West Third Street, Dayton, Ohio 45402
      Attorney for Appellee, Montgomery County Children's Services

KIRSTEN KNIGHT, Atty. Reg. No. 0080433, Post Office Box 137, Germantown, Ohio 45327
      Attorney for Appellant, D.D., mother

. . . . . . . . . . . .

HALL, J.

{¶ 1} D.D. ("Mother") appeals from the trial court's May 10, 2016 decision and

judgment entry terminating her parental rights and awarding appellee Montgomery County Children Services ("MCCS") permanent custody of her four minor children.[1]

**{¶ 2}** In her sole assignment of error, Mother contends the trial court erred in awarding permanent custody to MCCS because the agency failed to prove by clear and convincing evidence that such a disposition was in the children's best interest.

**{¶ 3}** The record reflects that MCCS filed complaints in December 2012 alleging that Mother's children, T.D., M.H.1, M.H.2, and M.H.3, were dependent and neglected. At the time of the complaints, the children ranged from two to five years old. The complaints included allegations of, among other things, homelessness and residing in shelters, domestic violence, poor school attendance, and a failure to obtain necessary care and services for the children who had various behavioral, emotional, and physical problems. In connection with a subsequent motion for interim temporary custody, MCCS provided an affidavit in which a caseworker averred that Mother had obtained housing but still lacked adequate food, adequate bedding, and adequate income. The affidavit also stated that Mother's residence had bed bugs and cockroaches. In addition, the affidavit repeated concerns about poor school attendance, failure to obtain necessary care and services for the children, and domestic violence in the home.

**{¶ 4}** In January 2013, the trial court awarded MCCS interim temporary custody. The children were placed in separate foster homes. In March 2013, the trial court adjudicated the children dependent and awarded MCCS temporary custody. In May 2014, the trial court granted a first extension of temporary custody. Also in May 2014, MCCS

---

[1] The trial court also terminated the parental rights of the two fathers of those children. Neither father appeared at the custody hearing below. Neither father has appealed from the trial court's permanent-custody ruling.

moved for permanent custody. The trial court overruled that motion and ordered a second extension of temporary custody in September 2014. Thereafter, in December 2014, MCCS again moved for permanent custody. A magistrate held an April 2015 hearing on the motion. In July 2015, the magistrate filed a decision awarding MCCS permanent custody of all four children. Mother filed objections. The trial court overruled the objections, adopted the magistrate's decision, and entered judgment awarding MCCS permanent custody of the children in May 2016. This expedited appeal by Mother followed.

{¶ 5} A trial court's decision to grant permanent custody and to terminate parental rights must be supported by clear and convincing evidence. *In re L.C.*, 2d Dist. Clark No. 2010 CA 90, 2011-Ohio-2066, ¶ 14. We apply an abuse-of-discretion standard, and we will not disturb such a decision on evidentiary grounds "if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established." (Citation omitted.) *Id.*; *see also In re S.S.*, 2d Dist. Miami No. 2011-CA-07, 2011-Ohio-5697, ¶ 7. The phrase "abuse of discretion" implies a decision that is unreasonable, arbitrary, or unconscionable. *Id.* Therefore, a trial court's act of overruling a parent's objections and adopting a magistrate's decision terminating parental rights cannot be reversed based on a mere difference of opinion or substitution of our judgment for that of the lower court. *Id.*

{¶ 6} Having identified our standard of review, we turn now to the substantive issues before us. The standards governing permanent-custody motions are as follows:

R.C. 2151.414 establishes a two-part test for courts to apply when

determining a motion for permanent custody to a public services agency. The statute requires the court to find, by clear and convincing evidence, that: (1) granting permanent custody of the child to the agency is in the best interest of the child; and (2) either the child (a) cannot be placed with either parent within a reasonable period of time or should not be placed with either parent if any one of the factors in R.C. 2151.414(E) are present; (b) is abandoned; (c) is orphaned and no relatives are able to take permanent custody of the child; or (d) has been in the temporary custody of one or more public or private children services agencies for twelve or more months of a consecutive twenty-two month period. * * *

R.C. 2151.414(D) directs the trial court to consider all relevant factors when determining the best interest of the child, including but not limited to: (1) the interaction and interrelationship of the child with the child's parents, relatives, foster parents and any other person who may significantly affect the child; (2) the wishes of the child; (3) the custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors in R.C. 2151.414(E)(7) through (11) are applicable.

*In re S.J.*, 2d Dist. Montgomery No. 25550, 2013-Ohio-2935, ¶ 14-15.

**{¶ 7}** Here the trial court made the findings required to award MCCS permanent custody. Specifically, it found, among other things, that the children had been in MCCS's temporary custody for more than 12 months of a consecutive 22-month period and that an award of permanent custody to the agency was in the children's best interest. On appeal, Mother does not dispute the trial court's "12 in 22" finding, which is supported by the record. Therefore, the only remaining issue is whether the trial court's best-interest finding is supported by clear and convincing evidence. *In re M.R.*, 2d Dist. Greene No. 2010 CA 64, 2011-Ohio-3733, ¶ 25.

**{¶ 8}** In its decision, the trial court made comprehensive findings, with citations to the record, on each of the statutory best-interest factors. Given the detailed nature of the trial court's findings and their significance to the outcome of the present appeal, we have elected to quote those findings in full (except for the trial court's discussion of the two Fathers' non-compliance with their case-plan objectives, which we have omitted).

**{¶ 9}** The trial court analyzed the best-interest factors as follows:

* * * Pursuant to R.C. 2151.414(D)(1), to determine if it is in the best interest of the children to permanently terminate parental rights and grant permanent custody to MCCS, the Court shall consider all relevant factors, including, but not limited to, the following:

*a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child.*

[M.Z-K.] has been M.H.2's foster parent since January of 2013,

approximately twenty-seven months. (Tr. 8:18) There are three other children in the [Z-K.] home and M.H.2 interacts with those children as if he has been with them forever. (Tr. 23:25, 24:13) [M.Z-K.] would definitely like to consider adopting M.H.2. (Tr. 24:7)

[C.K.] has been M.H.3's foster mother since January of 2013. (Tr. 29:22) M.H.3 was two and a half years old when he first came to live with her. (Tr. 30:17) M.H.3 goes to counselling because he is so attached to his foster father that during a military deployment of Mr. [K.] M.H.3 was so distressed that he began to revert to his old behaviors and counseling was required. (Tr. 33:10) M.H.3 has a very strong attachment to Mr. [K.] (Tr. 33:12) Ms. [K.] also has a strong bond with M.H.3. (Tr. 34:14) M.H.3 gets along well with the other children in the home, loves them, and is very protective of them. (Tr. 35:5) Moreover, M.H.3 is bonded with the [Ks'] extended family. (Tr. 35:20) Should the court grant the state permanent custody, the [Ks] would be interested in adopting M.H.3. (Tr. 35:11)

[S.B.] is M.H.1's foster parent, and has been for approximately seven months. (Tr. 40:7) M.H.1 came into Ms. [B's] care in the beginning of September 2014. (Tr. 47:5) Ms. [B.] states that the family is very, very bonded. (Tr. 45:21) There are four other children that live in Ms. [B's] home; her two sons aged twenty and thirteen, and two other foster children, a six-year-old girl, and a nine-year-old boy. (Tr. 45:23) M.H.1 is very bonded with the female foster child. (Tr. 46:7). If the Court grants the state permanent custody, the foster family would like to adopt M.H.1. (Tr. 45:3)

As for M.H.3, he has been with his foster family for half of his life and there has been total integration into the family. (Tr. 274:22) M.H.3 is bonded with his foster parents, the other children in the home, [and] the foster family's extended family. (Tr. 274:25)

Mother feels that she is in a better position now than she was when the children were removed from her care. (Tr. 260: 21) Mother feels that she is now in a position to meet all the needs of the children. (Tr. 261:14) The Mother wants her children placed back with her. (Tr. 261:23) M.H.3 appeared to be very bonded to Mother during the visit, whereas the other children played and talked between themselves and only interacted with Mother when they had a question or wanted something. (Tr. 115:13)

When visitation was initially set up, Mother was to visit with T.D. and M.H.1 on one day and then visit separately with M.H.2 and M.H.3. (Tr. 145:21) The visitations were separated because Mother was having a difficult time controlling and maintaining all four children at one time. (Tr. 146:20) In January or February of 2014, MCCS slowly began getting the Mother and the four children together for visitation. (Tr. 147:15) [Caseworker] Ms. Seal observed a visitation between Mother and all four children the day before the hearing, and noted that the kids were jumping around, running wild, and screaming. (Tr. 147:18) When Ms. Seal addressed these concerns with Mother, Mother says that the children are just excited to see her. (Tr. 148:4). Mother does attempt to calm the children

down, but typically the poor behavior continues. (Tr. 148:10)

[A.H.] is Mother's paramour and is currently residing with Mother. (Tr. 229:14) Mr. [A.H.] has been visiting with the children, and feels bonded to the children. (Tr. 232:4)

Based on the foregoing, the Court finds that this factor weighs in favor of granting permanent custody to MCCS.

*b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with regard for the maturity of the child.*

M.H.1 has told [S.B.] that she wishes to return home to her Mother. (Tr. 47:21) Lilah Findley has been a therapist with Samaritan Behavioral Health for five years, and has worked with M.H.1 since June of 2014. (Tr. 60:22) M.H.1 has indicated to Ms. Findley that she would like to return to her Mother's care. (Tr. 73:18)

[J.B.] has been T.D.'s foster parent for the last two years. (Tr. 49:17) T.D. has told [J.B.] that she wants to go home to her Mother. (Tr. 58:2).

The Guardian ad Litem reports that both T.D. and M.H.1 have made substantial progress and their behaviors have moderated. (Tr. 273:20) Both T.D. and M.H.1 have made clear to the GAL that they want to return home to Mother. (Tr. 273:21)

The wishes of M.H.2, and M.H.3 are unknown.

Based on the foregoing, the Court finds that this factor weighs neither for nor against granting permanent custody to MCCS as to M.H.2 and

M.H.3, but against granting permanent custody to MCCS as to T.D. and M.H.1.

    *c) The custodial history of the child.*

    MCCS became involved with this family upon being notified by the staff at a homeless shelter of some concerns regarding the family. (Tr. 130:8) MCCS filed for protective supervision in October 2012, and interim protective supervision was granted. (Tr. 130:14) The children entered the care of MCCS on January 15, 2013, due to some truancy issues involving the school aged child, as well as some concerns about M.H.2's communication capabilities, the behavior problems of the children, and the condition of the family's home. (Tr. 130:20) Upon entering the home on the day of the ex parte, January 15, 2013, Ms. Seal found that there was limited furniture, limited food, and cockroaches which led to a concern that mother was unable to provide for the children. (Tr. 131:4) Pursuant to the Dependency Complaint, there were also allegations of domestic violence and possible abuse occurring in the home. In January 2013, all four children were placed in foster homes. (Tr. 130:20, 182:9)

    Ms. [Z-K.] has been the foster parent to M.H.2 since he was removed from his home, approximately twenty-seven months. (Tr. 8:18) Ms. [K.] has been the foster mother for M.H.3 since his removal from the home. (Tr. 29:22) Ms. [S.B.] has been a foster parent to M.H.1 since September 2014, approximately seven months. (Tr. 40:7, 47:5) Ms. [J.B.] has been a foster parent to T.D. for the past two years. (Tr. 49:17)

Based on the foregoing, the Court finds that this factor weighs in favor of granting permanent custody to MCCS.

*d) The child's need for a legally secure placement and whether that type of placement can be achieved without granting permanent custody to the Agency.*

A Dependency Complaint was filed as to all four children on December 12, 2012, and amended January 15, 2013. Ex Parte interim temporary custody was granted to MCCS on January 15, 2013, and temporary custody was granted to MCCS on March 1, 2013. The first extension of temporary custody was granted to MCCS on May 16, 2014. On July 15, 2014, Mother filed a Motion for Extension of Temporary Custody. MCCS filed for permanent custody of the four children on May 21, 2014. On September 11, 2014, a second extension of temporary custody to MCCS was granted. MCCS again filed for permanent custody on December 8, 2014. A hearing on the *Motion and Affidavit for Commitment to the Permanent Custody of MCCS* was held on April 22, 2015. On July 31, 2015, the *Magistrate's Decision and Judge's Order Granting the Motion for Permanent Custody* was filed by Magistrate Durden.

The children have spent a significant portion of their lives in the custody of MCCS and at the time of the hearing had spent over twenty-four months in foster care. (Tr. 130:20, 182:9) Considering the length of time the children have been removed from the home, the Court finds that the children

are in desperate need of a legally secure, permanent placement. Randall Stump, Guardian ad Litem for all four children, recommended in both his April 16, 2015, *Report of Guardian ad Litem* and at the hearing 1) that T.D. and M.H.1 be returned to Mother with one year of protective supervision and 2) that MCCS be granted permanent custody of M.H.2 and M.H.3. (Tr. 273:13, 274:18, 275:2)

As required by O.R.C. 2151.412, MCCS developed a case plan for the family. The most recent case plan was adopted by the Court on September 11, 2014. Mother, both Fathers, and all four children were included on the case plan. (Tr. 134:16)

Mother's case plan objectives are as follows: complete a psychological evaluation and parenting assessment and follow any recommendations; complete a parenting education class; take domestic violence education classes; participate in a visitation assessment with her children; at the request of any service providers, participate with any service providers and the children; maintain income and housing and sign release of information. (Tr. 135:25) Mother is aware that MCCS developed a case plan for her. (Tr. 245:20) Ms. Seal reviewed the case plan with Mother at every monthly home visit, at any semi-annual reviews, and at any court hearings. (Tr. 135:7) Mother never indicated that she did not understand her case plan objectives. (Tr. 135:21)

The psychological evaluation was a part of Mother's case plan so that MCCS could make sure that there were not any mental health concerns

that would affect Mother's ability to parent the children. (Tr. 140:14) Ms. Seal referred Mother through Clinical Services at MCCS where a psychological evaluation was completed. (Tr. 140:19) Based upon the psychological evaluation, Ms. Seal made referrals for parenting classes and for individual mental health therapy for Mother. (Tr. 142:23) Mother was referred to Day-Mont Behavioral Health and Eastway for individual counseling. (Tr. 143:14) Mother followed up with counseling at Eastway and feels she benefitted from the counseling. (Tr. 143:19, 253:9) Mother was asked to do a second psychological assessment, which she did. (Tr. 192:20) Mother had a psychological evaluation and went to Samaritan Behavioral health for an assessment. (Tr. 252:14) Mother completed the psychological evaluations requested of her. (Tr. 191:10).

Parenting classes were a part of Mother's case plan to help her get a better understanding of discipline, her parenting ability, help her to provide structure for the children, and learn about developmental milestones and how to incorporate those into her parenting. (Tr. 138:25) Ms. Seal referred Mother to KYTES, a parenting class at MCCS, in the fall of 2013. (Tr. 139:14) Mother also was referred to Allene Anderson of Celebrating Families in the fall of 2013. (Tr. 139:19) Mother attended some of the KYTES classes, but was eventually withdrawn from the classes because she failed to attend regularly. (Tr. 139:14) Mother did not reengage with KYTES, but found a class through the Miami Valley Child Development Centers that she completed. (Tr. 139:24) Ms. Seal was able to verify

Mother's completion of parenting classes at Miami Valley Child Development Centers, which was acceptable to MCCS. (Tr. 140:6) Mother has completed her parenting classes. (Tr. 192:25, 245:3) This case plan objective is complete.

Because Mother reported a long history involving domestic violence between herself and [one of the Fathers, M.H. Sr.,] domestic violence classes were a part of the case plan. (Tr. 136:21, 138:6) In November 2012, Ms. Seal made a referral for Mother to the Artemis Center, where Mother completed domestic violence education classes in March of 2013. (Tr. 138:12, 192:11, 246:2) This case plan objective is complete.

A visitation assessment was a part of the case plan because the Visitation Center supervisor had many concerns after the children's first visit with Mother. (Tr. 144:23) Mother completed a visitation assessment. (Tr. 145:9) This case plan objective is complete.

Mother's participation with the children's service providers was a part of the case plan because it is important for Mother to be involved with the children's therapy. (Tr. 154:7) Mother had been asked to participate with the children's treatment providers. (Tr. 193:7) Mother was given the information for all of the service providers for the children by Ms. Seal, and was expected to attend as needed by these providers. (Tr. 154:23, 155:1) This information was provided to Mother on the face-to-face contact sheet. (Tr. 155:11) Ms. Seal spoke with Mother about the children's appointments every time there was a home visit or a meeting with Mother, and at the Semi

Annual Review at MCCS. (Tr. 155:19) Ms. Seal notified Mother once in writing of when the children's appointments took place. (Tr. 254:6)

Mother called Ms. Seal requesting the names of the service providers. (Tr. 155:25) Ms. Seal provided Mother with the names and phone numbers of the children's service providers. (Tr. 156:8) Per Ms. Seal there were signed releases of information provided so that Mother could obtain the needed information from the service providers. (Tr. 156:16) MCCS believes that there was sufficient information provided to Mother to obtain information in order for her to participate with the children's providers. (Tr. 158:8) During home visits, Ms. Seal spoke with Mother about the service providers, provided their names and contact information to Mother, and told Mother how to contact the service providers to set up appointments. (Tr. 204:9) Ms. Seal believed that Mother understood what was going on with her children and how to contact the service providers. (Tr. 161:8) Mother testified that she tried to contact the doctor's offices directly to learn of the children's appointments, but had trouble getting the information. (Tr. 254:9) The doctor's offices said that they needed a signed release from Ms. Seal to release the information or that she could contact the foster mothers for the information. (Tr. 254:19) When Mother asked Ms. Seal about getting a signed release, Ms. Seal stated to her that she already had provided the releases but would look into it. (Tr. 255:1) Mother states that she never heard back from Ms. Seal regarding the signed releases. (Tr. 255:7)

Ms. Seal has contact with the service providers who provide her

with information as to how the children are doing and whether Mother participates. (Tr. 159:8) Ms. Seal spoke with Mother about contacting the service providers and Mother stated that she had contacted some of them and was in the process of getting appointments with them. (Tr. 159:16) Mother spoke with South Community and Children's regarding M.H.2, and with Samaritan Behavioral Health regarding M.H.1. (Tr. 160:5) Mother attempted to attend M.H.1's counseling appointments, but was told that she would have to attend individual appointments instead. (Tr. 256:1) Mother did meet individually with M.H.1's counselor. (Tr. 256:7) M.H.3 receives therapy in the foster home and Mother asked to attend the therapy sessions but was denied. (Tr. 257:20).

Mother was notified of M.H.3's surgeries at Dayton Children's and she attended those surgeries. (Tr. 257:15) Mother was also present also for M.H.2's cochlear implant surgery, as was Mr. [A.H.]. (Tr. 258:6) Mother states that she was unaware of all the appointments for M.H.2. (Tr. 266:11) However, Mother was aware of when M.H.2's audiology appointments were and attended some but not all of the appointments. (Tr. 161:20) Mother missing those appointments is a concern to MCCS because if she were to regain custody Mother would be expected to follow through with all of the children's appointments and Mother has not been able to consistently show that she can do that. (Tr. 162:12).

M.H.2 alone has had over thirty appointments in the last two months. (Tr. 193:10) The other children have a number of appointments as well. (Tr.

193:14) Between all the children, there are about forty appointments a month. (Tr. 212:1) The children's appointments are in Middletown, Springboro, Shelby County, Darke County, and Miami County. (Tr. 194:17) Many of the appointments are located outside of Dayton based on where the children were placed. (Tr. 194:12) The appointments could be moved to Dayton. (Tr. 194:9) Ms. Seal is aware that Mother is on public transportation. (Tr. 194:1) There were no steps taken by MCCS to secure appointments in Dayton so that Mother could attend. (Tr. 194:12) Mother stated that she would have to become a stay at home mom to get all of the children to their appointments. (Tr. 162:23) Mother stated that if she had to be a stay at home mom that she would support herself using M.H.2's social security money and would utilize public transportation to get around. (Tr. 163:1) Ms. Seal concedes that with the current service providers there is no reason to expect that Mother, while working a full-time job, could make all the appointments. (Tr. 217:7)

While she made an effort to complete the case plan objective of participating with the service providers, Mother has not successfully completed said objective as she has not been consistent in following through or going to appointments for the service providers, specifically those in Montgomery County. (Tr. 161:12, 164:3)

Housing was a case plan objective because MCCS wants all parents to have safe, stable housing for their children to live in. (Tr. 164:7) To Ms. Seal's knowledge, Mother is presently current on her rent and utilities. (Tr.

189:19) Mother obtained independent housing in December 2014. (Tr. 164:19) Ms. Seal has asked for a copy of the lease, which has not yet been provided to her. (Tr. 165:10) Mother is currently residing at [a residence] in Dayton. (Tr. 165:22) Ms. Seal has been to this residence five times. (Tr. 165:23) The utilities have been on at the home and are in Mother's name. (Tr. 166:8) Mother lives in the home with her paramour of approximately one year, [A.H.]. (Tr. 166:16) The home has sufficient space for all four children, and is furnished for all four children. (Tr. 166:21) In the kitchen there was a table with four chairs, the utilities were working, there was food in the house, there were two couches in the living room, and there are dressers and beds in each bedroom. (Tr. 214:20) Additionally, Ms. Seal observed food in the home. (Tr. 190:4)

MCCS still has concerns about the stability of Mother's independent housing. (Tr. 167:3) Because of Mother's history of housing instability MCCS would like to see Mother maintain independent housing for six to twelve months; currently Mother has maintained independent housing for five months. (Tr. 167:7, 212:21) While MCCS concedes that Mother's Housing objective is essentially complete, it stresses that the housing has not been stable per MCCS's expectations. (Tr. 168:6) Furthermore, while not concerned with the condition of the home, MCCS has concerns about the sparse furnishings of the home. (Tr. 189:25).

Income was a part of the case plan so that Mother could provide for the needs of the children. (Tr. 168:11) When MCCS first became involved

with the family, Mother was unemployed and supporting the family with the social security benefits received by one of the children. (Tr. 168:15) MCCS made referrals to the Job Center for Mother every month at home visits, at any case plan meetings, and at the Semi Annual Review Hearing. (Tr. 168:22) However, Mother denies that she was ever referred to the Job Center to aid her in finding employment. (Tr. 264:8)

In July 2014, Mother secured employment at Belton that lasted two to three months. (Tr. 169:18) Mother provided Ms. Seal with pay stubs to verify her employment at Belton. (Tr. 170:3) Mother was earning minimum wage at Belton, which was insufficient to care for the needs of all the children. (Tr. 170:6) Shortly after she started working at Belton, Mother found another form of employment with MS Properties. (Tr. 170:13) However, her employment with MS properties was not verified. (Tr. 171:1) Mother's employment at MS Properties ended in December of 2014. (Tr. 171:6)

In February 2015, Mother worked for two weeks at Delphi before she had to quit because her employment schedule conflicted with her visitation schedule. (Tr. 171:8, 247:6) Mother is currently employed with a staffing agency, iForce, and is working full-time at Creative Extruding Products. (Tr. 172:2, 172:17, 214:3, 248:25) Ms. Seal has seen paystubs to verify this employment. (Tr. 172:8, 248:25, 264:6)

MCCS requires that Mother maintain income for six to twelve months to demonstrate stability in keeping a steady income to provide for the family.

(Tr. 172:19) Mother was asked to secure employment and has had a series of jobs, sometimes two jobs at a time, in the last two years. (Tr. 246:6) Mother started her current job just a month ago which is insufficient to satisfy the case plan objective for stable income. (Tr. 218:15) MCCS does not consider Mother's income objective to be met as she has failed to be consistently employed for a stable, significant period of time. (Tr. 173:5).

Mother completed the case plan objective of signing releases of information and Ms. Seal had no troubles obtaining the signed releases of information. (Tr. 136:16) This case plan objective is complete.

MCCS remains concerned that Mother does not have the ability to maintain housing, maintain income, and attend all of the appointments for the four children. (Tr. 173:12) MCCS believes that it is in the best interests of the children for permanent custody to be granted to MCCS because there are concerns about Mother's ability to independently care for the children based on the concerns regarding the service providers and being able to maintain stable income and housing. (Tr. 183:10) The permanency plan for all four children would be to create an adoption case plan, transfer the children to adoption, have a matching conference, and recruiting efforts to place the children. (Tr. 183:19).

\* \* \*

The children have spent a good deal of time in the custody of MCCS and the care of their foster families. Considering the length of time the children have been removed from the home, the Court finds that the children

are in desperate need of a legally secure, permanent placement.

Based on the above, the Court finds that the children cannot and should not be placed with Mother within a reasonable period of time. In light of the foregoing, the Court finds that a legally secure, permanent placement cannot be achieved without granting permanent custody to MCCS. Accordingly, the Court finds that this factor weighs in favor of granting permanent custody to MCCS.

*e) Whether any of the factors in O.R.C. 2151.414(E)(7)-(11) apply in relation to the parents and child.*

No O.R.C. 2151.414(E)(7)-(11) factors are applicable in the present case.

After considering all relevant factors, the Court finds that permanent custody to MCCS is in the best interest of the children. Neither Mother nor either Father have completed their case plan and none are a suitable option for custody of the children. All available extensions of temporary custody have been utilized and the Court finds that the children are in desperate need of a legally secure, permanent placement.

The Court finds by clear and convincing evidence that a legally secure, permanent placement for the children cannot be achieved without granting permanent custody to MCCS. In light of the foregoing, the Court finds that clear and convincing evidence was presented showing that permanent custody to MCCS is in the best interest of the children.

IN CONCLUSION, the Court finds by clear and convincing evidence

that (1) the children have been in the temporary custody of MCCS for over twelve months of a consecutive twenty-two month period, and (2) that permanent custody to MCCS is in the best interest of the children. Accordingly, the *Motion and Affidavit for Commitment to the Permanent Custody of MCCS* filed by MCCS is GRANTED.

(Doc. #5 in Trial Ct. Case No. 2012-8811, at 5-16).

{¶ 10} On appeal, Mother challenges the trial court's best-interest determination. Her entire substantive argument is as follows:

In this case, the trial court granted permanent custody to Montgomery County Children's Services despite testimony indicating that Mother had completed most of the requirements of her case plan. The Agency's position was that although she had housing and income, she had not either for a long enough period of time. However, the testimony at the hearing was that Mother completed the psychological and parenting assessment, followed through with recommendations, did the visit assessment and visited with the children. She also obtained and maintained housing and income. The Guardian ad Litem indicated that the children wanted to return home to their Mother. The girls in particular made substantial progress with their behavior and stated to the Guardian ad Litem on numerous occasions that they wanted to live with their Mother. This is not a case where the parent has made no progress on their case plan and has shown no initiative to cooperate with the Agency. On the contrary, Mother worked with the Agency and made substantial progress on her case

plan. The Agency's biggest complaint seemed to be that Mother failed to attend all of the appointments that the children had. However, the Agency placed all 4 children in separate foster homes. There were not all placed within Montgomery County and Mother used the bus for transportation. She also had a job. On one hand, the Agency required her to obtain and maintain income but on the other hand they expected her to attend the numerous appointments the children had. The statute requires that the trial court find by clear and convincing evidence that it is in the best interest of the child to be placed in the permanent custody of the Agency and that the child cannot be placed with either parent within a reasonable time. In this instance two of the children, the girls, wanted to return home to Mother and even the Guardian ad Litem recommended that. If the Agency's position was that 6 months of housing and income was what they were looking for, Mother was within a short period of time of doing just that. Mother complied with the Agency, she completed the vast majority of her case plan and she wants legal custody of her children. Based upon the relevant factors of the statute, the trial court erred when it granted permanent custody to the Agency.

(Appellant's brief at 6-7).

{¶ 11} Upon review, we find Mother's argument to be unpersuasive. We recognize that Mother had satisfied most of her case-plan objectives. Nevertheless, the trial court reasonably expressed concern over the fact that Mother, who had a long history of inadequate income and housing, had been in her current job only one month and had established independent housing for only five months at the time of the permanent-

custody hearing. By that time, the children had been in foster care for more than two years, where they were doing well, the second (and final) extension of temporary custody had expired, and the trial court reasonably found a need for permanency that Mother had not yet demonstrated she could provide. The trial court also reasonably expressed concerns about Mother's ability to attend the children's numerous behavioral, psychological, and medical appointments with various care providers. It was reasonable to infer that if Mother was unable to attend the appointments herself, she likewise would have trouble getting her children to the appointments if she regained custody. Indeed, Mother essentially admitted as much in her own testimony. She testified that she would need to keep her job to maintain her housing and to provide for her children. (Tr. 267: 4-10) She also testified, however, that if she had custody of the children she would not be able to work and would need to be a stay-at-home mother. (Tr. 271: 8-15; Tr. 162: 23-25) This testimony supports a conclusion that Mother cannot both work and parent the children effectively, which supports an award of permanent custody to MCCS. On appeal, Mother criticizes MCCS for expecting her to maintain income while also attending appointments, but that is what would be required if she obtained custody.

{¶ 12} Although Mother had completed most of her case-plan requirements, that fact is not dispositive with regard to the trial court's best-interest determination. Because the children had been in MCCS's custody for more than 12 months of a 22-month period, the focus, at that point, was on what was best for the children. "[A] parent's case plan compliance, while it may be relevant to a best interest analysis, does not automatically override a trial court's decision regarding what is in a child's best interests." *In re M.B.*, 4th Dist. Highland No. 15CA19, 2016-Ohio-793, ¶ 59, citing *In re N.L.*, 9th Dist. Summit

No. 27784, 2015-Ohio-4165, ¶ 35. When the focus is on the child's best interest, a trial court conceivably could terminate parental rights even if a parent completed all of her case-plan objectives. *Id.* The case plan is simply "a means to a goal, but not the goal itself," and other considerations still may justify an award of permanent custody to a children-services agency. *In re J.H.*, 12th Dist. Clinton Nos. CA2015-07-014, CA2015-07-015, 2016-Ohio-640, ¶ 47 (citations omitted); *see also In re R.P.*, 2d Dist. Montgomery Nos. 26744, 26754, 2015-Ohio-4295, ¶ 17 ("While Father and Mother admittedly made progress on their case plans, that fact is not dispositive of their child's best interest. The trial court is best positioned to weigh the various best-interest factors, and an award of permanent custody to the State can be appropriate even when just one of those factors supports such a disposition.").

{¶ 13} Mother also argues that her two daughters wanted to return to her and that the guardian ad litem supported such a disposition. While that is true, we note that the girls were only five and seven years old at the time of the permanent-custody hearing. While their wishes were relevant, the trial court was not bound to follow them in making its best-interest determination. Nor was the trial court obligated to follow the advice of the guardian ad litem. *In re N.M.*, 2d Dist. Montgomery Nos. 26693, 26719, 2016-Ohio-318, ¶ 41.

{¶ 14} Finally, Mother asserts that the trial court was required to find that it was in the best interest of her children for them to be placed in the permanent custody of MCCS *and* to find that the children could not be placed with her "within a reasonable time." (Appellant's brief at 7). But this is not true. As set forth above, the only remaining consideration at the time of the permanent custody hearing was the best interest of the

children. Because they had been in MCCS's custody for more than 12 months of a 22-month period, there was no longer a need to consider whether the children could be placed with her "within a reasonable time." *In re K.L.*, 2d Dist. Greene No. 2014-CA-31, 2014-Ohio-5576, ¶ 14.

{¶ 15} Mother undoubtedly made sincere and significant efforts in this case, which we find to involve a close and difficult decision regarding the proper disposition. Nevertheless, we cannot say, based on the record before us, that the trial court abused its discretion in finding by clear and convincing evidence that an award of permanent custody to MCCS was in the children's best interest. We are not permitted to reverse the trial court's judgment based on a mere difference of opinion, or a substitution of our opinion for that of the lower court, where the record supports the trial court's chosen disposition. *In re S.S.*, 2d Dist. Miami No. 2011-CA-07, 2011-Ohio-5697, ¶ 7.

{¶ 16} Based on the reasoning set forth above, we overrule Mother's assignment of error and affirm the judgment of the Montgomery County Common Pleas Court, Juvenile Division.

. . . . . . . . . . . .

FAIN, J., concurs.

FROELICH, J., concurring:

{¶ 17} I agree that the trial court was faced with a close and difficult decision. Our standard of review is whether the trial court abused its discretion in finding by clear and convincing evidence that permanent custody was in the children's best interest. Fortunately or unfortunately, the law provides that at some point there can be no more extensions or attempts to establish the biological parent-child relationship; and,

fortunately or unfortunately, the 12/22 standard, two extensions of temporary custody, and a lengthy court process sometime almost predetermine that the best interests of the children is a forward-looking legally secure placement.[2]   The court thoroughly reviewed the evidence regarding each child and did not abuse its discretion.

. . . . . . . . . .

Copies mailed to:

Mathias H. Heck
Meagan D. Woodall
Kirsten Knight
Hon. Anthony Capizzi

---

[2] *See, e.g.*, albeit in a different context, Father Knows Best: The unwed father's right to raise his infant surrendered for adoption.   60 Fordam Law Review 971 (April 1992).