[Cite as *In re C.P.*, 2021-Ohio-323.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

IN RE: C.P., L.P., J.P.

      :

      :

      :     Appellate Case Nos. 28833, 28834,

      :     28835

      :

      :     Trial Court Case Nos. 2017-0511,

      :     2017-0514, 2017-0515

      :

      :     (Appeal from Common Pleas Court-

      :     Juvenile Division)

. . . . . . . . . . .

# O P I N I O N

Rendered on the 5th day of February, 2021.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by JAMIE J. RIZZO, Atty. Reg. No. 0099218, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
      Attorney for Appellee, Montgomery County Children Services

CARL A. LUX Atty. Reg. No. 0078524, 1985 Red Robin Drive, Xenia, Ohio 45385
      Attorney for Appellant, Father

. . . . . . . . . . . .

WELBAUM, J.

**{¶ 1}** The Montgomery County Court of Common Pleas, Juvenile Division, granted permanent custody of Mother's and Father's three minor children, J.P., C.P., and L.P., to Montgomery County Children Services ("MCCS"). Only Father has appealed. His sole assignment of error is that the judgment granting permanent custody to MCCS was not in the children's best interests.[1]

**{¶ 2}** For the reasons that follow, we conclude that the trial court did not err in concluding that awarding custody to MCCS was in the children's best interests. Accordingly, the judgments of the trial court will be affirmed.

## I. Facts and Course of Proceedings

**{¶ 3}** According to the facts presented in the trial court, MCCS has dealt with this family for a number of years, with the oldest case dating back to 2002. At the time the neglect and dependency complaints were filed in this case on January 25, 2017, Mother and Father were living in a rental home with five children: C.P., Jr. (age 17); T.P. (age 14); C.P. (age seven); L.P. (age four), and J.P. (age three). The four older children were male, and the youngest child was female.

**{¶ 4}** Although MCCS had previous involvement with the family, this particular case arose from events that occurred on January 19, 2017, when C.P., Jr. walked from his home to the Montgomery County, Ohio Juvenile Detention Center to ask for help. C.P., Jr. was in high school, and he claimed that Father locked him in his room from the time he came home from school until it was time to go to school the next day. The child

---

[1] Because Mother did not appeal, "we need only address the merits of the trial court's judgment as it relates to Father." *In re M.J.C.*, 2019-Ohio-2353, 138 N.E.3d 626, ¶ 1, fn. 1 (2d Dist.).

reported that he had no bed or blanket, that there was no heat or light in the room, and that he slept on the floor. He also stated that Father gave him a bucket to use as a toilet. According to C.P., Jr., Father was angry because C.P., Jr. was failing in school. Both parents also felt he was stealing things at home or school. J.C. Case No. 2017-515, Motion and Affidavit for Interim Temporary Custody, Affidavit, p.1.[2]

{¶ 5} When the police did a welfare check on January 19, 2017, they found locks on more than one bedroom door and buckets of urine in two bedrooms. *Id.* After receiving a referral, MCCS visited the home, and Mother and Father admitted that they locked C.P., Jr., in his room. MCCS also observed a bucket of urine in a bedroom which had no furnishings. The two oldest brothers were not at home, and the parents refused to let MCCS talk to the three younger children. However, MCCS observed severe scabbing over most of the face of C.P., who was seven years old and was not enrolled in school. *Id.*

{¶ 6} After interviewing C.P., Jr. at school, MCCS filed neglect and dependency complaints concerning all the children on January 26, 2017, and requested interim temporary custody at an ex parte hearing. The court granted temporary custody to MCCS and appointed a guardian ad litem for the children. Following a shelter care hearing, a magistrate granted MCCS temporary custody, ordered a case plan to be filed, and ordered an adjudication and disposition hearing for March 10, 2017. In addition, the magistrate ordered that the parents were to have no contact with the children except for supervised visitation through MCCS.

---

[2] Although there were originally five cases, the two oldest children are not at issue here. Because three cases are still involved, we will refer to the docket in J.C. Case No. 2017-515 unless otherwise indicated.

**{¶ 7}** The initial case plan, filed in February 2017, stated that Mother and Father were to attend and complete an agency-approved parenting plan. Further, the parents were to schedule and complete a mental health assessment with an agency-approved provider and follow through with all recommendations. They were also to maintain their home in a safe and sanitary condition and to sign all requested releases.

**{¶ 8}** After holding the adjudicatory hearing, the court granted temporary custody to MCCS on March 17, 2017.[3] Initially, Mother made progress on her case plan, and MCCS investigated relatives and others who could take custody of the children. J.P. was placed with Mother's daughter, C.H., from March until July 2018, when C.H. was evicted from her apartment. Transcript of Proceedings ("Tr.") p. 61. MCCS also investigated placing of the three boys with their maternal grandmother, A.Y. As a result, MCCS filed a motion on June 15, 2017, asking the court to transfer custody to A.Y. *See* Motion to Transfer Custody to A.Y. In addition, MCCS asked that J.P. be placed in the parents' legal custody. The court granted this latter request on July 13, 2017, and gave Mother interim legal custody of J.P., effective the date of the order. The court also set a disposition hearing for August 16, 2017. *Id.*

**{¶ 9}** However, before the hearing, a number of things occurred that caused MCCS to ask to withdraw its motion to transfer custody to A.Y. and to seek to remove all the children again and place them in foster care. Specifically, A.Y. was having difficulty

---

[3] As MCCS notes in its brief, copies of this order were not in the files transmitted to the court of appeals. *See* Appellee's Brief, p. 1, fn. 1. However, the record refers to the order, the existence of the order was not disputed below, and it has not been disputed on appeal. Rather, the only issue that has been raised is whether the grant of permanent custody was in the children's best interests. Therefore, this is the only issue we will consider. *Compare In re T.D.*, 2d Dist. Montgomery No. 27136, 2016-Ohio-7245, ¶ 7.

managing the boys.   She also told MCCS that Mother and Father had taken the boys and had refused to give them back.   Tr. p. 63 and Aug. 11, 2017 GAL Report, p. 2.

{¶ 10} Furthermore, Father had been arrested at around 11:00 p.m. on August 6, 2017.   At the time, Mother and all four of the younger children were in the car.   GAL Report at p. 4.   The arrest followed a traffic stop, during which the policed learned that Father did not have a driver's license.   They also found a crack pipe in Father's left rear pocket.   A further search revealed a bag of marijuana and two pieces of crack cocaine. *Id.*   Father claimed the crack cocaine belonged to Mother, and both parents denied drug use.   *Id.*   Because a third party owned the car, the police did not pursue charges relating to the crack cocaine.   *Id.*   However, they did arrest Father for the other violations.

{¶ 11} After the arrest, Father tested positive in August 2017 for cocaine, heroin, and marijuana.   Tr. p. 73.   Mother also tested positive for cocaine and THC.   Motion and Affidavit for First Extension of Custody, Affidavit, p. 1.   Due to these issues, the court allowed MCCS to withdraw its motion to give A.Y. custody and also terminated Mother's interim temporary custody of J.P.

{¶ 12} Because the parents had not disclosed any drug use, MCCS did not include substance abuse assessments in the initial case plan.   However, following the August 2017 events, MCCS added substance abuse assessments for both parents.   Tr. p. 90.

{¶ 13} In November 2017, MCCS filed a motion for a first extension of temporary custody.   The GAL recommended that the motion be granted because neither parent had made progress on the mental health/substance abuse objective.   Dec. 11, 2017 GAL Report, p. 3.   After continuing the matter for service, the magistrate granted the first extension of custody on February 22, 2018.   At that time, Father had failed to attend

numerous visits, was not engaged with MCCS, and had several warrants out for his arrest. Feb. 22, 2018 GAL Report, p. 3. Father was also unemployed and had not had a substance abuse assessment following the August 2017 positive drug screen. *Id.* Mother had also missed visits, and while she reported seeing a therapist weekly, the therapist contradicted this. *Id.* In addition, Mother was not engaged in any services. *Id.* Due to the lack of progress, the GAL concluded that neither parent was a candidate for reunification at the time. *Id.*

**{¶ 14}** The first extension of custody was set to expire on July 26, 2018. Magistrate's First Extension of Temporary Custody, p. 2. A hearing was set for June 25, 2018, to review the status of temporary custody prior to its expiration. Subsequently, on June 21, 2018, MCCS filed a motion and affidavit seeking permanent custody of J.P., L.P., and C.P, and a planned permanent living arrangement ("PPLA") for T.P., who was nearly 16 years old. *See* Motion and Affidavit for Permanent Custody.

**{¶ 15}** At that point, according to the affidavit, Mother had made little progress on her case plan objectives; Father was incarcerated after escaping from the MonDay Program and had a pending charge for felony escape. *Id.* at Affidavit, p. 1. In addition, Father had made little progress on his case plan and did not visit regularly with the children. *Id.*

**{¶ 16}** The permanent custody hearing was held on December 6, 2018. A few days before the hearing, the GAL filed a report, recommending that the court award permanent custody of J.P., L.P., and C.P. to MCCS, and that T.P. be placed in a PPLA. *See* Dec. 4, 2018 GAL Report, p. 10. After hearing the evidence, the magistrate concluded that MCCS should be granted permanent custody of the younger children and

that T.P. should be placed in a PPLA.

**{¶ 17}** Father filed objections and supplemental objections to the magistrate's decision, but Mother did not file any objections. After MCCS replied to the objections, the juvenile court overruled Father's objections on June 11. 2020. *See* Judge's Final Appealable Order. The court, therefore, awarded MCCS permanent custody of J.P., L.P., and C.P., and also held that placing T.P. in a PPLA was in his best interest. *Id.* at p. 14. Father then timely appealed from the court's judgment. As noted, Mother did not appeal.

## II. The Best Interests of the Children

**{¶ 18}** Father's sole assignment of error states that:

The Trial Court's Decision Was Not in the Best Interests of the Children.

**{¶ 19}** Under this assignment of error, Father lists the appropriate statutory factors to consider in deciding the children's best interests and lists facts relating to those factors. However, Father does not actually argue that the factors weigh in his favor. Instead, he appears to be arguing that he is willing to parent his children and that he should be excused due to his incarceration, which prevented his participation in the case plan. In contrast, MCCS argues that the trial court correctly decided that awarding permanent custody to the agency was in the children's best interests.[4]

**{¶ 20}** "The United States Supreme Court has stated that parents' interest in the

---

[4] The only children addressed on appeal are J.P., C.P., and L.P. Father did not mention T.P. or assign any error concerning the PPLA placement.

care, custody, and control of their children 'is perhaps the oldest of the fundamental liberty interests recognized by this Court.' "  *In re B.C.*, 141 Ohio St.3d 55, 2014-Ohio-4558, 21 N.E.3d 308, ¶ 19, quoting *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000).   Ohio has also held that "parents who are 'suitable' have a 'paramount' right to the custody of their children."   *B.C.* at ¶ 19, quoting *In re Perales*, 52 Ohio St.2d 89, 97, 369 N.E.2d 1047 (1977).   (Other citations omitted.)

{¶ 21} Nonetheless, " 'the natural rights of a parent are not absolute, but are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.' "   *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979), quoting *In re R.J.C.*, 300 So.2d 54, 58 (Fla.App.1974). "Ultimately, parental interests are subordinate to the child's interest when determining the appropriate resolution of a petition to terminate parental rights."   *B.C.* at ¶ 20.

{¶ 22} Ohio's custody statutes recognize the importance of a child's best interest. Under R.C. 2151.414(B)(1), courts use a two-part test when deciding motions seeking an award of permanent custody to a public services agency.   This statute requires courts "to find, by clear and convincing evidence, that: (1) granting permanent custody of the child to the agency is in the best interest of the child; and (2) either the child (a) cannot be placed with either parent within a reasonable period of time or should not be placed with either parent if any one of the factors in R.C. 2151.414(E) are present; (b) is abandoned; (c) is orphaned and no relatives are able to take permanent custody of the child; or (d) has been in the temporary custody of one or more public or private children services agencies for twelve or more months of a consecutive twenty-two month period." *In re S.J.*, 2d Dist. Montgomery No. 25550, 2013-Ohio-2935, ¶ 14, citing *In re K.M.,* 8th

Dist. Cuyahoga No. 98545, 2012-Ohio-6010, ¶ 8.

{¶ 23} "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

{¶ 24} Here, there is no dispute that the children were in the custody of MCCS for 12 or more months of a consecutive 22-month period. As a result, the only issue to consider was whether awarding permanent custody to MCCS was in the children's best interests. In this regard, "R.C. 2151.414(D) directs the trial court to consider all relevant factors when determining the best interest of the child, including but not limited to: (1) the interaction and interrelationship of the child with the child's parents, relatives, foster parents and any other person who may significantly affect the child; (2) the wishes of the child; (3) the custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors in R.C. 2151.414(E)(7) through (11) are applicable." *S.J.* at ¶ 15.

{¶ 25} The trial court found, after applying the relevant factors, that an award of custody was in the best interests of J.P., L.P., and C.P. We review the court's decision

for abuse of discretion and will not disturb permanent custody decisions "on evidentiary grounds 'if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established.' " *In re T.D.*, 2d Dist. Montgomery No. 27136, 2016-Ohio-7245, ¶ 5, citing *In re L.C.*, 2d Dist. Clark No. 2010-CA-90, 2011-Ohio-2066, ¶ 14. "The phrase 'abuse of discretion' implies a decision that is unreasonable, arbitrary, or unconscionable." *Id.* As a result, "a trial court's act of overruling a parent's objections and adopting a magistrate's decision terminating parental rights cannot be reversed based on a mere difference of opinion or substitution of our judgment for that of the lower court." *Id.*

{¶ 26} With the above standards in mind, we will consider the factors outlined in R.C. 2151.414(D).

(A) The Children's Interaction/Interrelationship With Others

{¶ 27} R.C. 2151.414(D)(1)(a) requires the court to consider "[t]he interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child." We will discuss each child separately, beginning with J.P.

(1) J.P.

{¶ 28} J.P. was three years old when she was initially removed from the parents. At the time of the hearing, J.P. had lived with her foster parents for about 15 months. According to the foster father, J.P. did not have good behavior when she came to live with

them. She had outbursts and would scream and yell at them. Tr. p. 8. Since being with the foster family, this behavior had declined. *Id.* J.P. was in kindergarten and excelling. Tr. p. 10. J.P. called her foster parents "mom" and "dad" and called her foster siblings "Sissy" and "Brother." The foster family was interested in adopting J.P. Tr. p. 11.

{¶ 29} Visitation was once a week. Between visits with Mother, J.P. did not talk about her mother or want to see Mother. J.P. usually did not want to go to visits. Tr. p. 13. J.P. also almost never talked about her father; when she did, it was negative. Tr. p. 16. After visits, there were times that J.P. had outbursts in the car, kicked the back seat, and said her foster parents did not love her because she was just a foster kid. Tr. p. 17. Once J.P. was back in the foster parents' home, they were able to moderate her behavior, but it usually took a half-day or a day. Tr. p. 18. J.P. had also told her foster parents that her biological brothers were mean to her. *Id.*

{¶ 30} When the three youngest children first went into foster care, J.P. was placed with her brothers. However, they continuously fought and beat each other up, and the foster placement asked that J.P. be removed due to the ongoing violence. Tr. p. 105.

## (2) C.P.

{¶ 31} C.P. was seven years old when he was removed from the parents' home and had not yet been enrolled in school. As a result, he was enrolled in kindergarten as a seven-year old in February 2017. Motion to Transfer Custody to A.Y., Affidavit, at p. 1.

{¶ 32} At the time of the custody hearing, C.P. and L.P. had been with their foster

parents for over a year.   When they first came, they were quiet and would not eat.   Tr. p. 20.   C.P. had significant allergies to both food and plants and went to an allergist.   He also had asthma.   *Id.*   Furthermore, C.P. had serious skin problems (eczema), such that medication had to be in place constantly.   Tr. p. 20, 23, and 41.

**{¶ 33}** Both C.P. and L.P. were very angry with Father.   They often talked about how they were going to get him, and that it was his fault they were in foster care.   Tr. p. 25.   They had told their foster mother that they did not want to be in the same room with Father, and that if he came home, they were going to run away.   *Id.*

**{¶ 34}** The boys' behavior had improved since they first went to the foster mother's home.   When they arrived, they did not know anything, even colors.   Tr. p. 26.   Sometimes the boys said they wanted to go home, but a lot of times they said that they did not.   Tr. p. 36.   After visits, the boys acted negatively the next day at school.   Sometimes the teachers had to call the foster mother two or three times a day when L.P. was acting up.   *Id.*   Both of the boys did not sleep in their beds; they slept on the floor because they used to do that at home.   Tr. p. 46.

(3)   L.P.

**{¶ 35}** Both boys had anger problems, but L.P. was worse.   L.P. got into everything and put holes in the walls.   Tr. p. 23.   Both boys also had episodes where they got mad and destructive.   Tr. p. 43.   If. L.P. got mad at people, he took their things and tore them up.   Tr. p. 23 and 41.

**{¶ 36}** Both boys had special behavioral problems.   Despite being six and eight at the time of the hearing, they both still spoke like babies and were in speech therapy at

school.   Tr. p. 24.   L.P. also wet the bed every night, even though the foster mother got him up twice a night.   Tr. p. 32.

**{¶ 37}** Mother had missed significant amounts of visitation.   She visited at the beginning but then her visitation became sporadic.   Tr. p. 68.   Due to Mother's late shows or no shows, she was put on a schedule that required her to arrive an hour before visitations started.   Semi-Annual Review, p. 3.   In the fall of 2017, a commotion arose when the visitation center would not let A.Y. visit.   MCCS then learned that A.Y. had also been signing in by using Mother's name because Mother could not visit.   As a result, a policy of checking identification was put in place.   In addition, MCCS made sure the one-hour policy remained in place, and A.Y.'s visits were restricted.   Tr. p. 130-132, and 145-146.   Mother's visits were consistent in 2018.   Tr. p. 146.

**{¶ 38}** L.P. and C.P. were rambunctious during visitation and did not listen to Mother's redirection or requests to calm down.   Tr. p. 70-71.   As to Father's visitation, it was almost non-existent.   At the beginning of the case, Father visited, but after he became embroiled in his legal issues in August 2017, his visits became sporadic.   Motion for First Extension of Temporary Custody, Affidavit at p. 1; Dec. 11, 2017 GAL Report at p. 3; Feb.22, 2018 GAL Report at p. 3; Motion for Permanent Custody, Affidavit at p. 1; Dec. 4, 2018 GAL Report at p. 4.

**{¶ 39}** On February 1, 2018 (or more than a year after the children were removed), Father was indicted for knowingly conveying drugs of abuse into a correctional facility, a third-degree felony.   State's Ex. 1.   On March 30, 2018, Father pled guilty to a reduced charge of attempting to convey drugs into a correctional facility.   He was placed on community control on April 25, 2018, with the requirement that he attend the Secured

Offender Transitional Program ("STOP") in lieu of a 180-day residential community sanction in jail. State's Ex. 2 and 4. However, Father left the program before completing it and was charged with escape on June 26, 2018. State's Ex. 6. After pleading to the escape charge, Father was sentenced to nine months in prison, to be served consecutively to his nine-month sentence in the prior case, for a total of 18 months in prison. State's Ex. 5, 7, and 8. Father was in prison at the time of the custody hearing and therefore had not visited with his children due to his incarceration, which was projected to end on October 25, 2019. Tr. p. 199.

{¶ 40} These facts weighed in favor of granting permanent custody to MCCS and provided competent, credible evidence to support the trial court's decision.

(B) The Children's Wishes

{¶ 41} Under R.C. 2151.414(D)(1)(b), courts must consider "[t]he wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child." Regarding this factor, the court noted that the record was silent concerning the wishes of J.P., L.P., and C.P. Judge's Final Appealable Order, p. 7.

{¶ 42} The children were quite young at the time of the custody hearing, and they were not interviewed by the court. In a report filed just before the hearing, the GAL did not indicate that any of the children expressed a desire to live with Father. December 4, 2018 GAL Report.

{¶ 43} To the extent any significance could be given to this factor, it was neutral.

### (C)   Custodial History

{¶ 44} R.C. 2151.414(D)(1)(c) requires the court to consider "[t]he custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *."   Here, the children were in MCCS's custody for the requisite period.   In addition, as the trial court noted, MCCS made multiple attempts to find living arrangements for the children, including placing them temporarily with relatives, but none of these attempts succeeded.   Dec. 4, 2018 GAL Report at p. 7.   Accordingly, this factor supported the court's decision to award permanent custody to MCCS.

### (D)   Need for Permanent Placement

{¶ 45} R.C. 2151.414(D)(1)(d) directs the court to consider "[t]he child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency."

{¶ 46} The GAL's report filed just before the hearing indicated that the children were in need of permanency.   Dec. 4, 2018 GAL Report at p. 9.   At the time of the hearing, almost two years had elapsed since the children were initially removed, and neither parent had completed the case plan goals.   Specifically, neither parent presented evidence of completing substance abuse treatment or mental health assessments and any recommendations that followed.   *See* Tr. p. 65, 66, 67, 74, 90, 101, 102, 104, 109, 112, 115, 119, 134-136, 141, 149, 174, 186-187, 196, and 201.   As previously noted, the visitation objectives were also not complete.   *See also* Tr. p. 73 and 130-132.   None of

Father's objectives were complete, as he was unemployed, had no income, and was in prison.

{¶ 47} Furthermore, MCCS would not have changed its recommendation for permanent custody even if Mother had completed all the case plan objectives. Tr. p. 141. In this regard, the MCCS supervisor stressed that:

> We have some severe – some serious concerns regarding the care and the neglect and abuse the kids had suffered while in the care of their parents, the original case opening, the situation that happened last summer as to why we removed the kids.
>
> We tried to reunify the children with the parents before. It's – parents – we completed drug screens. Both parents had cocaine. Dad had heroin, both parents were positive for marijuana. I don't have completed drug treatment at this point.

Tr. p. 141.

{¶ 48} The caseworker went on to discuss Mother's mental health diagnosis that had never been addressed, Mother's failure to deal with the children properly during visitations, and Mother's inability to keep up with the children,[5] and finished by stating that, "I have grave concerns." Tr. p. 142. Furthermore, Father showed no recognition that his discipline methods had been a problem. Despite the fact that discipline in the home was "really extremely inappropriate," with the children being locked in their rooms

---

[5] Mother had a stroke in 2013 and, as a result, had significantly compromised mobility. She walked with a cane and did not have much range of motion in her left arm, left leg, and the left side of her body. March 13, 2017 GAL Report, p. 2; December 12, 2018 GAL Report at p. 3; and Tr. p. 66.

and "pooping and peeing in buckets," Father testified that his relationship with his children was "beautiful." Tr. p. 143 and 195. This remark also showed a complete disconnect with how the children felt.

{¶ 49} Under the circumstances, there is more than sufficient competent, credible evidence to support the trial court's decision to award permanent custody to MCCS.

(E)   Other Statutory Factors

{¶ 50} The final consideration under the "best interest" test is "[w]hether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child." R.C. 2151.414(D)(1)(e). The trial court did not find that any of these factors applied, and we agree.

{¶ 51} Finally, as noted, Father argues in his brief that he has a "willingness" to raise his children, and that his incarceration interfered with his ability to work the case plan. Appellant's Brief, p. 11. We disagree.

{¶ 52} Father had ample opportunity to work on the case plan before he was sent to prison, but made little attempt to comply or complete case plan objectives. His choices to convey drugs into a correctional institution and to leave a drug treatment program before completion (thereby violating the terms of his community control and incurring an escape charge), were just that – choices. *Compare In re Smith*, 2d Dist. Miami No. 2001-CA-54, 2002 WL 538888, *3 (Apr. 12, 2002) (noting in case involving incarcerated father that "[m]erely alleging his willingness to do services is hardly a basis for considering [father] as a potential care giver for a child who was in custody for over nine months as of the date of the permanent custody complaint); *In re B.F.*, 2d Dist. Miami No. 2008-CA-

11, 2008-Ohio-5156, ¶ 26 (noting, when affirming grant of permanent custody, that among other things, mother "could have chosen to participate in a residential treatment program, yet she elected to go to prison").

**{¶ 53}** Based on the preceding discussion, Father's sole assignment of error is overruled.

## III.   Conclusion

**{¶ 54}** Father's assignment of error having been overruled, the judgments of the trial court are affirmed.

. . . . . . . . . . . .

DONOVAN, J. and HALL, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Jamie J. Rizzo
Carl A. Lux
Carl Bryan
James Armstrong
Griff Nowicki
Hon. Anthony Capizzi