[Cite as *In re R.P.*, 2015-Ohio-4295.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | |
|---|---|
| IN RE: | :   Appellate Case Nos. 26744 |
| | :               26754 |
| R.P. | : |
| | :   Trial Court Case No. JC 2011-2333 |
| | : |
| | :   (Juvenile Appeal from |
| | :    Common Pleas Court) |
| | : |
| | : |

. . . . . . . . . . .

O P I N I O N

Rendered on the 16th day of October, 2015.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by MICHELE PHIPPS, Atty. Reg. No. 0069829, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, P.O. Box 972, 301 West Third Street, Dayton, Ohio 45402
     Attorney for Appellee, Montgomery County Children Services

THOMAS G. KOPACZ, Atty. Reg. No. 0091202, Holzfaster, Cecil, McKnight & Mues, 1105 Wilmington Avenue, Dayton, Ohio 45420
     Attorney for Appellant-Father

MARK A. FISHER, Atty. Reg. No. 0066939, Staton, Fisher & Conboy LLP, 5613 Brandt Pike, Huber Heights, Ohio 45424
     Attorney for Appellant-Mother

. . . . . . . . . . . .

HALL, J.

{¶ 1} R.P. (Father) and S.P. (Mother) appeal separately from the trial court's

judgment entry terminating their parental rights and awarding appellee Montgomery Country Children Services (MCCS) permanent custody of their child R.P.[1]

{¶ 2} In two related assignments of error, Father claims the trial court's findings regarding the best interest of the child being served by awarding MCCS permanent custody are against the weight of the evidence. In her sole assignment of error, Mother likewise contends the trial court's best-interest findings are against the weight of the evidence.

{¶ 3} The record reflects that MCCS initially became involved in February 2011 after receiving a referral involving allegations of neglect. Specifically, MCCS received information that R.P., who was born in 2009, and another child in Father and Mother's home were dirty, smelled of urine, and had bedbugs and lice. (Tr. at 20). At that time, caseworker Cheryl Larcom observed filthiness in the home, roaches in the kitchen, and a hazardous hole in the ceiling. (*Id.* at 22). The home's yard was strewn with trash and debris. (*Id.*). Larcom discussed the situation with Father and Mother and provided case-management and referral services. (*Id.* at 24). Although no children were removed from the home on that occasion, Larcom filed a March 2011 dependency complaint with regard to R.P.[2] (Doc. #159).

{¶ 4} In July 2011, the trial court adjudicated R.P. dependent. (Doc. #144). MCCS subsequently obtained interim temporary custody in May 2012, and R.P. was placed in

---

[1] We note that Father and the child at issue have the same initials. For purposes of our analysis herein, we will use the initials R.P. only when referring to the child. We will refer to the child's parents as "Father" and "Mother."

[2] Although Mother has other children, they are not the subject of the present appeal, which concerns only the trial court's permanent custody decision regarding R.P.

foster care. (Doc. #133). The trial court made this disposition based, in part, on its finding that the child's home lacked running water and remained "filthy" and "unsanitary." (*Id.*). Thereafter, in August 2012, the trial court issued a full temporary custody order in favor of MCCS. (Doc. #117). The trial court extended that award of temporary custody in June 2013 and in April 2014 to allow Father and Mother to work on their case plans. (Doc. #54, 96).

{¶ 5} On April 29, 2014, MCCS moved for permanent custody of R.P. (Doc. #56). A magistrate held an August 8, 2014 hearing on that motion after the second extension of temporary custody expired. At the hearing, the magistrate heard testimony from Father, Mother, Father's probation officer, three MCCS case workers, and a court-appointed psychologist who had evaluated Father and Mother. The magistrate also heard from R.P.'s guardian ad litem. Based on the evidence presented, the magistrate filed an October 9, 2014 decision awarding MCCS permanent custody. (Doc. #24). Father and Mother separately filed objections and supplemental objections. (Doc. # 8, 10, 21, 23). On June 16, 2015, the trial court overruled the objections. It also found that R.P. had been in MCCS' custody for more than 12 months of a consecutive 22-month period, that Father and Mother had not completed their case-plan objectives, and that an award of permanent custody to MCCS was in the child's best interest. (Doc. # 5). This expedited appeal by Father and Mother followed.

{¶ 6} A trial court's decision to grant permanent custody and to terminate parental rights must be supported by clear and convincing evidence. *In re L.C.*, 2d Dist. Clark No. 2010 CA 90, 2011-Ohio-2066, ¶ 14. We apply an abuse-of-discretion standard, and we will not disturb such a decision on evidentiary grounds "if the record contains competent,

credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established." (Citation omitted). *Id.*; *see also In re S.S.*, 2d Dist. Miami No. 2011-CA-07, 2011-Ohio-5697, ¶ 7. The phrase "abuse of discretion" implies a decision that is unreasonable, arbitrary, or unconscionable. *Id.* Therefore, a trial court's act of overruling a parent's objections and adopting a magistrate's decision terminating parental rights cannot be reversed based on a mere difference of opinion or substitution of our judgment for that of the lower court. *Id.*

{¶ 7} Having identified our standard of review, we turn now to the substantive issues before us. The standards governing permanent-custody motions are as follows:

R.C. 2151.414 establishes a two-part test for courts to apply when determining a motion for permanent custody to a public services agency. The statute requires the court to find, by clear and convincing evidence, that: (1) granting permanent custody of the child to the agency is in the best interest of the child; and (2) either the child (a) cannot be placed with either parent within a reasonable period of time or should not be placed with either parent if any one of the factors in R.C. 2151.414(E) are present; (b) is abandoned; (c) is orphaned and no relatives are able to take permanent custody of the child; or (d) has been in the temporary custody of one or more public or private children services agencies for twelve or more months of a consecutive twenty-two month period. * * *

R.C. 2151.414(D) directs the trial court to consider all relevant factors when determining the best interest of the child, including but not limited to:

(1) the interaction and interrelationship of the child with the child's parents, relatives, foster parents and any other person who may significantly affect the child; (2) the wishes of the child; (3) the custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors in R.C. 2151.414(E)(7) through (11) are applicable.

*In re S.J.*, 2d Dist. Montgomery No. 25550, 2013-Ohio-2935, ¶ 14-15.

{¶ 8} Here the trial court made the findings required to award MCCS permanent custody. Specifically, it found, among other things, that R.P. had been in the agency's temporary custody for more than 12 months of a consecutive 22-month period and that an award of permanent custody to the agency was in the child's best interest. On appeal, neither Father nor Mother challenges the trial court's "12 in 22" finding, which is supported by the record. Therefore, the only remaining issue is whether the trial court's best-interest finding is supported by clear and convincing evidence. *In re M.R.*, 2d Dist. Greene No. 2010 CA 64, 2011-Ohio-3733, ¶ 25. In its decision, the trial court made the following findings with regard to each of the statutory best-interest factors:

* * * Pursuant to R.C. 2151.414(D)(1), to determine if it is in the best interest of the child to permanently terminate parental rights and grant permanent custody to MCCS, the Court shall consider all relevant factors,

including, but not limited to, the following:

*a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child.*

Angela Polla[r]d, the ongoing caseworker for the child from February 2011 to November 2012, and Kevin Foley, the current ongoing caseworker from Montgomery County Children Services for the child, both testified that the child appears to be bonded to his foster parents. (Tr. 62:9) Mr. Foley also testified that both Mother and Father are fairly bonded with the child. (Tr. 85:3; 126:4, 126:10) Dr. Rhonda Lilley, the psychologist who has worked this case and evaluated the parents, agrees that the child is bonded with his Mother. (Tr. 155:15) Finally, Father himself believes that he has a strong bond with his son. (Tr. 271:22) Based on the foregoing, the Court finds that this factor does not weigh in favor of granting permanent custody to MCCS.

*b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with regard for the maturity of this child.*

The child is too young to express an opinion as to custody.

*c) The custodial history of the child.*

The child was removed from the home and placed into the custody of MCCS in May 2012. (Tr. 97:23) Since that time the child has remained in the custody of MCCS. The parents have failed to take the appropriate action

to regain custody of their child for almost thirty-six months.

Based on the foregoing, the Court finds that this factor weighs in favor of granting permanent custody to MCCS.

*d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without granting permanent custody to the Agency.*

Interim Temporary Custody was granted to MCCS on May 9, 2012, and Temporary Custody was granted to MCCS on August 21, 2012, due to the condition of the parents' home. On June 5, 2013, the first extension of Temporary Custody was granted. The second extension of Temporary Custody was granted orally in Court on April 15, 2014, and the Decision docketed on April 29, 2014. Both available extensions of temporary custody have been utilized. MCCS filed the most recent *Motion and Affidavit for the Commitment to the Permanent Custody of MCCS* on April 29, 2014, and a hearing on the Motion was held on August 8, 2014. On October 9, 2014, the *Magistrate's Decision and Judge's Order Granting the Motion for Permanent Custody* was filed by Magistrate Durden.

The child has spent a good portion of his life in the custody of MCCS and over thirty-six months in foster care. Considering the length of time the child has been removed from the home, and the fact that both extensions of temporary custody have been granted, the Court finds that the child is in desperate need of a legally secure, permanent placement. Mr. Rezabek, GAL, recommended permanent custody to MCCS in his August 7, 2014,

*Updated GAL Report to the Court.*

As required by R.C. 2151.412, MCCS developed a case plan for both Mother and Father. The most recent case plan was adopted by the Court on April 29, 2014. Both Mother and Father, together with the child, were included on the case plan. (Tr. 74:18) Ms. Polla[r]d and Mr. Foley each reviewed and discussed the case plan with Mother and Father. (Tr. 34:23, 75:1, 88:17, 235:4) Neither Mother nor Father gave any indication to Ms. Polla[r]d or Mr. Foley that they did not understand the case plan. (Tr. 35:1, 75:5, 88:2, 235:4) In fact, Mother herself specifically testified that she reviewed the case plan with Mr. Foley, she understood what she was required to do, and she underst[ood] that in order to be reunited with her son that the housing needed to be acceptable. (Tr. 235:4)

The case plan objectives for Mother were as follows: maintain clean and stable housing; maintain stable income; be involved in making sure that there are hygiene supplies for the children; participate in parenting and psych evaluation; and sign releases of information. (Tr. 75:9)

The objectives for Father were as follows: maintain clean and stable housing; maintain verifiable proof of income; sign releases of information; participate in parenting and psychological evaluation; and to be involved in anger management.

Maintaining the dental needs of the child was not part of either parent's case plan. (Tr. 64:18)

Unfortunately, while there was progress made on the case plan, not

all the objectives were met by either parent. (Tr. 35:4)

The general concern of the agency was that they had not seen enough of a stable consistency of the house being clean. (Tr. 79:9) MCCS made it clear to the parents that the home needed to be clean and stable for a minimum of six months before they could consider reunification with the child. (Tr. 79:14)

Mother has failed to meet her case plan objectives. Mother has not completed the objective of six months maintenance of a clean home. (Tr. 79:18) MCCS's objective for Mother obtaining her own income was necessary because MCCS wanted to be able to verify that Mother could maintain the home beyond a reasonable period of time on her own. (Tr. 79:21). Mother has not provided a proof of income and it is unknown to MCCS if Mother is currently employed. (Tr. 80:3, 80:6) Mother has provided MCCS with documentation that she filed to incorporate a home preservation business in June 2014. (Tr. 80:7) However, when Mr. Foley inquired as to any income she has received, she indicated that she had not received any income from any of the work she had done for the business. (Tr. 80:11) Mr. Foley spoke with Mother repeatedly about going back to work or going to the job center. (Tr. 80:22) Mother stated that she didn't feel she was physically able to work. (Tr. 80:24). Neither parent has followed up with any of the income related referrals or recommendations. (Tr. 81:1).

Mother states that she has shampoo, conditioner, lotion, towels, deodorant, and cologne waiting for her son's return. (Tr. 214:5) Father

agrees, noting that they have a home and travel set of hygiene supplies for the child. (Tr. 270; 16)

In January of 2013, Mother completed a parenting and psychological evaluation. (Tr. 81:13) Mother has just recently begun to follow the recommendation that she return to mental health counseling despite the recommendation having been made several months ago. (Tr. 81:9) Mr. Foley had made monthly referrals for Mother to follow through with Crisis Care, to supply Day-Mont with her phone number, and to reengage with mental health services each month. (Tr. 81:20). However, from January 2013 through July 2014, Mother had failed to re-engage. (Tr. 82:2)

Mother engaged in mental health treatment with Mahajan Therapeutics in July of 2014. (Tr. 81:15) While progress has been made on this objective, the objective is not complete. (Tr. 82:9)

Mother's objective to sign releases of information is necessary so that the Agency can communicate with providers and coordinate care and make sure that compliance with care was followed through with properly. (Tr. 82:12) Mother has failed to provide or sign all releases of information as instructed. (Tr. 82:20) Mother has only provided two signed releases throughout the course of this case. (Tr. 82:21). First, Mother signed a release in April 2014 only after significant pressure from the Court. (Tr. 82:22) Then in July of 2014, Mother signed a release to allow MCCS to speak with Mahajan Therapeutics. (Tr. 82:25)

Maintaining stable housing is necessary for re-unification because

there were significant concerns about keeping utilities in the home on, keeping the child properly cleaned, and the dental care of the child. (Tr. 86:14). MCCS states that the parents need to reengage and demonstrate that they can meet those needs on an ongoing basis. (Tr. 86:19) So far the parents have been unable to demonstrate that they are ready to reunify with the child. (Tr. 87:3) MCCS notes that Mother has taken a step in the right direction with keeping the home cleaner. (Tr. 87:7) However, MCCS feels that Mother would also need to maintain involvement with mental health care to help her meet the physical, mental, and emotional needs of the child. (Tr. 87:12) MCCS is also concerned about possible domestic violence in the parents' home. (Tr. 87:16). Mother had expressed concerns to the child's foster mother about domestic violence in the home against her by Father. (Tr. 87:18) Specifically, instances in which Father prevented Mother from going to the door to answer the knocks of the MCCS caseworker to get entry into the home and allegations that Father had beat on Mother's back. (Tr. 87:21)

MCCS had two primary concerns before reunification was possible. (Tr. 86:3) First, MCCS was concerned that they had not seen a stable maintaining of the household such that the parents would be ready to begin reunification with the child. (*Id.*). Additionally, MCCS was concerned because Mother has not done a good job of following through with returning to mental health counseling and addressing her issues. (*Id.*) Mother failed to meet the two most important objectives. Mother failed to maintain clean

and stable housing, and failed to maintain a stable income. Mother did secure hygiene supplies for the child, did participate in parenting and psych evaluation, and did sign releases of information, albeit after significant pressure from the Court. Mother simply has failed to fulfill her case plan objectives.

Father has made minimal progress on his case plan objectives. Father has made some progress on the anger management objective. (Tr. 89:16) Documentation received through a release from CADAS indicated that Father was involved in treatment in 2009. (Tr. 89:18) However, there has been no proof of any completion of any anger management course. (Tr. 89:20) While Father has worked very hard to maintain the utilities to the home, he has been unable to keep all the utilities stable for the required six month period of time. (Tr. 91:2) Father simply has not been able to maintain the home for a six month period of time. (Tr. 95:7) In April 2014 MCCS received documentation from February 2014 indicating Father was employed by Safe Home Preservation Program and was earning a small amount of money at a stable rate. (Tr. 92:23) However, no pay stubs have been provided. (Tr. 92:3) The case plan objective for income is not completed but in progress. (Tr. 92:18) Father has not followed through with any recommendations concerning mental health counseling, and while he did complete the parenting and psychological evaluations he failed to follow through with any referrals or recommendations from the evaluation. (Tr. 92:22; 93:8) In regard to signing releases, Father has only signed one

release throughout the course of this case and that was accomplished after court involvement. (Tr. 93:16) Regardless of how or when it was accomplished, the objective in regard to signing releases has been completed. (Tr. 93:24)

Father has failed to maintain clean and stable housing and has failed to maintain verifiable proof of income[.] Father did sign releases for information, did participate in parenting and psychological evaluations, and was involved in anger management. Father has failed to achieve his case plan objectives.

Based on the above, the Court finds that the child cannot and should not be placed with Mother or Father within a reasonable period of time. In light of the foregoing, the Court finds that a legally secure, permanent placement cannot be achieved without granting permanent custody to MCCS. Accordingly, the Court finds that this factor weighs heavily in favor of granting permanent custody to MCCS.

*e) Whether any of the factors in R.C. 2151.414(E)(7)-(11) apply in relation to the parents and child.*

None of the R.C. 2151.414(E)(7)-(11) factors apply in the present case.

(Doc. #5 at 4-8).

**{¶ 9}** Based on the foregoing analysis, the trial court concluded:

After considering all relevant factors, the Court finds that permanent custody to MCCS is in the best interest of the child. Neither Mother nor

Father have completed their case plan and neither are a suitable option for custody of the child. While both parents seemed to make more of an effort to work on their case plan objectives in the past few months, this is unfortunately an example of too little, too late. All extensions of temporary custody have been granted and the Court finds that the child is in desperate need of a legally secure, permanent placement.

The Court finds that a legally secure, permanent placement for the child cannot be achieved without granting permanent custody to MCCS. In light of the foregoing, the Court finds that clear and convincing evidence was presented showing that permanent custody to MCCS is in the best interest of the [child].

(*Id.* at 8).

**{¶ 10}** On appeal, Father stresses that he is bonded with R.P. and that he visited appropriately with the child while the case was pending below. (Father's brief at 12). Father further argues that he made many repairs to the parties' home in the months prior to the permanent-custody hearing. (*Id.* at 13-14). Father also asserts that he maintained necessary utility service to the home in the six-month period preceding the hearing, except for a temporary water shut off to repair broken pipes. (*Id.*). Although Vectren gas service had not been re-established at the time of the hearing, Father argues that it was not needed given the summer season and that he intended to convert the home to electric heat in the future anyway. (*Id.* at 13-14). With regard to income, Father contends that he can support R.P. though his employment as a handyman with Safe Home Preservation Program. Finally, Father argues that he participated in parenting and psychological

evaluations, signed releases, and had been referred for anger-management treatment. While conceding that he did not complete every case-plan objective, Father insists that he made "remarkable progress" and that "[t]his should not be considered a too little too late case[.]" (*Id.* at 15).

{¶ 11} As for Mother, she challenges the trial court's analysis and weighing of the statutory best-interest factors. Her primary focus, however, is on R.P.'s need for a legally secure permanent placement and whether that type of placement can be achieved without granting permanent custody to MCCS. (Mother's brief at 14-15). On that issue, Mother contends a legally secure placement can be made with her and Father. She asserts that R.P. is well bonded with them, that their house is appropriate (and had been appropriate for at least two months prior to the permanent custody hearing), and that she "arguably substantially completed all of her case plan objectives." (Id. at 14). Therefore, she contends the evidence supports a finding that she and Father can care for R.P. (*Id.*).

{¶ 12} Upon review, we see no error in the trial court's best-interest findings, which are supported by clear and convincing evidence. The record reflects that Father and Mother have a history of failing to provide suitable, sanitary living conditions. When MCCS initially became involved, their home was described as "filthy" with cockroaches in the kitchen and trash and debris strewn around the yard. (Tr. at 22). At that time, Mother admitted having had problems with lice and bedbugs but claimed to have gotten rid of them. (*Id.* at 21). Thereafter, Father and Mother moved to a different location. An MCCS caseworker testified that that house was fine initially but "started to go downhill progressively." (*Id.* at 35). The caseworker described things such as no running water, a toilet filled with feces and urine, moldy food, broken glass, and a strong odor inside the

home. (*Id.* at 36). Mother and Father later moved to their current home. Mother testified that they had spent several months prior to the permanent-custody hearing renovating that house. (*Id.* at 236). Father testified that his own father actually owned the house. According to Father, he and Mother were living there rent free. (*Id.* at 260). Father confirmed that he had performed major renovation work on the house. (*Id.* at 261).

{¶ 13} At the time of the permanent-custody hearing in August 2014, however, caseworker Kevin Foley testified that their current house was cluttered and in need of "constant cleaning" and that renovation work remained ongoing. (*Id.* at 78). Foley also noted that shortly before the hearing, he had been denied access to the basement and the upstairs rooms. (*Id.*). In Foley's opinion, he "had not seen enough of a stable consistency in terms of that house being clean." (*Id.* at 79). We note too that Vectren gas service remained shut off. When questioned about that issue, Mother acknowledged having a delinquent Vectren bill. (*Id.* at 198). Although she and Father hoped to convert to electric heat to avoid needing Vecten's services for the upcoming winter, Mother admitted that they had not bought all of the supplies to make the conversion because "it takes money." (*Id.* at 199). In addition, while electric service had been restored to the home, Father acknowledged having an unpaid bill of $3,785 with the Dayton Power & Light Company. (*Id.* at 265).

{¶ 14} With regard to income, the record reflects that Mother had started a home-preservation business a few months before the permanent-custody hearing. (*Id.* at 80, 219). In her testimony, however, she was able to identify just one invoice for $710 that had been sent out for work performed by her company. (*Id.* at 216). Net of expenses, she anticipated receiving about $40. (*Id.* at 248-249). Her only other income consisted of $347

per month in food stamps. (*Id.* at 223, 256). Despite her limited income, Mother failed to follow up with any job-related referrals or recommendations. (*Id.* at 80-81).

{¶ 15} As for Father, he provided documentation from February 2014 indicating that he worked for the Safe Home Preservation Program (which apparently was unrelated to Mother's business). (*Id.* at 92). Thereafter, MCCS never was able to verify any income for Father. (*Id.*). At the hearing, Father testified that he was a "general handyman" who worked by the job. (*Id.* at 269-270). He stated that he did not receive pay stubs and that any income he earned went directly into his bank account. (*Id.* at 270). Father explained that he had not done any work for the Safe Home program for "a while," however, because he had been incarcerated. In fact, he had just been released from jail following his June 23, 2014 arrest for carrying a concealed weapon while on probation for prior offenses of receiving stolen property, theft, and misuse of a credit card. (*Id.* at 14, 273, 278). When questioned about any bank statements showing deposits into his account, Father expressed confidentiality concerns and opined that he "shouldn't have to show my monies to an open court." (*Id.* at 274).

{¶ 16} In light of the evidence before us and the trial court's findings, we see no error in its determination that an award of permanent custody to MCCS was in R.P.'s best interest. The record supports the trial court's "too-little-too-late" concerns about Father and Mother progressing on their case plans, particularly with regard to the housing and income requirements. The record also supports the trial court's finding that a legally secure placement could not be obtained without an award of permanent custody to MCCS. Although the current foster home was not an adoptive one, the record reflects that MCCS anticipated quickly moving R.P. into an adoptive home after obtaining

permanent custody. (Tr. at 139).

**{¶ 17}** While Father and Mother admittedly made progress on their case plans, that fact is not dispositive of their child's best interest. The trial court is best positioned to weigh the various best-interest factors, and an award of permanent custody to the State can be appropriate even when just one of those factors supports such a disposition. *In re N.Q.*, 2d Dist. Montgomery No. 25428, 2013–Ohio–3176, ¶ 71–72. Because the trial court's multiple best-interest findings here are supported by clear and convincing evidence, the appellants' assignments of error are overruled.

**{¶ 18}** The judgment of the Montgomery County Common Pleas Court, Juvenile Division, is affirmed.

. . . . . . . . . . . . .

FROELICH, P.J., and FAIN, J., concur.

Copies mailed to:

Mathias H. Heck
Michele D. Phipps
Thomas G. Kopacz
Mark A. Fisher
Hon. Anthony Capizzi