[Cite as *In re T.S.*, 2017-Ohio-482.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**GREENE COUNTY**

IN THE MATTER OF:              :     Appellate Case Nos. 2016-CA-26
                                         :                    2016-CA-28
         T.S.                        :
                                           :     Trial Court Case No. N44994
                                           :
                                           :     (Juvenile Appeal from
                                           :     Common Pleas Court)
                                           :
                                           :
                                           :

. . . . . . . . . . .

O P I N I O N

Rendered on the 10th day of February, 2017.

. . . . . . . . . . .

STEPHEN K. HALLER, Atty. Reg. No. 0009172, by NATHANIEL R. LUKEN, Atty. Reg. No. 0087864, Greene County Prosecutor's Office, 61 Greene Street, Xenia, Ohio 45385
     Attorney for Appellee, State of Ohio

HILARY LERMAN, Atty. Reg. No. 0029975, 249 Wyoming Street, Dayton, Ohio 45409
     Attorney for Appellant, Mother

MARCY A. VONDERWELL, Atty. Reg. No. 0078311, 120 West 2nd Street, Suite 333, Dayton, Ohio 45402
     Attorney for Appellant, Father

. . . . . . . . . . . . .

HALL, P.J.

{¶ 1} T.S. ("Mother") and S.S. ("Father") appeal separately from the trial court's judgment entry terminating parental rights to their minor child, T.S., and awarding permanent custody to appellee Greene County Children Services (GCCS).

{¶ 2} In his sole assignment of error in this expedited appeal, Father contends the trial court's decision is not supported by clear and convincing evidence. For her part, Mother advances five assignments of error. First, she asserts that the trial court's decision is against the weight of the evidence. Second, she claims the trial court erred in failing to address whether GCCS made reasonable efforts to reunify the family. Third, she argues that the trial court erred in finding an award of permanent custody to GCCS to be in the child's best interest. Fourth, she maintains that the trial court erred in "not discounting" a guardian ad litem's recommendation and in not appointing separate counsel for T.S. Fifth, she contends the trial court erred in not adequately considering T.S.'s wishes and in not appointing separate counsel to help the child adjudicate those wishes.

{¶ 3} The record reflects that T.S. resided with Mother in September 2013 when the child initially was adjudicated neglected and dependent. T.S. was four years old at that time.  The adjudication followed a domestic-violence incident in which Father, who lived separately, assaulted Mother in front of the child. As a result of that incident, an investigation ensued, resulting in concerns about Mother's stability and ability to care for the child. Following the neglect and dependency adjudication, GCCS was granted protective supervision. (Doc. #28).

{¶ 4} In January 2014, a second neglect and dependency complaint was filed. This complaint resulted in a second dependency adjudication based on stipulated facts and

an award of temporary custody to GCCS. (Doc. #69). In connection with both of the foregoing adjudications, the trial court found that GCCS had made "reasonable efforts" to prevent T.S.'s removal and continued removal from Mother's home and to return her to Mother. (Doc. #28, 69). Approximately one year later, in March 2015, the guardian ad litem filed a report indicating that Mother had done everything required of her and recommending that custody be returned to Mother with GCCS retaining protective supervision. (Doc. #110). Following a hearing, the trial court returned T.S. to Mother's custody in April 2015. (Doc. #113). That ruling also included a "reasonable efforts" determination. (*Id.*).

{¶ 5} In July 2015, GCCS filed a third dependency complaint. (Doc. #129). The complaint raised newfound concerns about Mother's stability and ability to meet T.S.'s basic needs. It also stated that GCCS had assumed "temporary custody through a voluntary custody agreement approved by [Mother]." (*Id.* at 3). The complaint requested an award of permanent custody to the agency. (*Id.* at 6).On August 14, 2015, the trial court granted interim custody to GCCS. (Doc. #140). Its ruling included a finding that the agency had made "reasonable efforts" to prevent T.S.'s removal and continued removal from Mother's home and to return her home. The ruling explained what those efforts included and why they had failed. (*Id.* at 4). GCCS's permanent-custody complaint proceeded to a three-day hearing before the trial court in January and February 2016. Following the hearing, the trial court filed a June 30, 2016 judgment entry in which it awarded GCCS permanent custody of T.S. and terminated Mother's and Father's parental rights. (Doc. #189). This appeal followed.

{¶ 6} A trial court's decision to grant permanent custody to the State and to

terminate parental rights must be supported by clear and convincing evidence. *In re L.C.*, 2d Dist. Clark No. 2010 CA 90, 2011-Ohio-2066, ¶ 14. We apply an abuse-of-discretion standard, and we will not disturb such a decision on evidentiary grounds "if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established." (Citation omitted.) *Id.*; *see also In re S.S.*, 2d Dist. Miami No. 2011-CA-07, 2011-Ohio-5697, ¶ 7. The phrase "abuse of discretion" implies a decision that is unreasonable, arbitrary, or unconscionable. *Id.* Therefore, a trial court's termination of parental rights cannot be reversed based on a mere difference of opinion or substitution of our judgment for that of the lower court. *Id.*

{¶ 7} Having identified our standard of review, we turn now to the issues before us. We note that "[t]here are two avenues by which an agency can obtain permanent custody of a child: (1) by requesting it in the abuse, neglect or dependency complaint under R.C. 2151.353 or (2) by filing a motion under R.C. 2151.413 after obtaining temporary custody." *In re S.B.*, 6th Dist. Lucas No. L-08-1453, 2009-Ohio-2290, ¶ 7. When an agency pursues the second method (by filing a permanent-custody motion under R.C. 2151.413 after obtaining temporary custody), a two-part test found in R.C. 2151.414 directly applies. *See* R.C. 2151.414 (addressing the procedure when a children-services agency files a motion for permanent custody). When an agency pursues the first method (by requesting permanent custody in the dependency complaint without first being awarded temporary custody), a slightly different approach applies but results in a similar analysis. *See* R.C. 2151.353(A)(4) (looking to the requirements of R.C. 2151.414 to determine whether an agency may be granted permanent custody when that

disposition is requested in a dependency complaint).

{¶ 8} Here GCCS previously had obtained temporary custody of T.S. But the child had been returned to Mother before the agency became involved again. GCCS's most recent activity involved filing a *third* dependency complaint and requesting permanent custody therein, without again formally obtaining temporary custody. (Doc. #129). Therefore, the procedure set forth in R.C. 2151.353 appears to apply. It authorizes a trial court to order the following disposition for a dependent child:

(4) Commit the child to the permanent custody of a public children services agency or private child placing agency, if the court determines in accordance with division (E) of section 2151.414 of the Revised Code that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent and determines in accordance with division (D)(1) of section 2151.414 of the Revised Code that the permanent commitment is in the best interest of the child. If the court grants permanent custody under this division, the court, upon the request of any party, shall file a written opinion setting forth its findings of fact and conclusions of law in relation to the proceeding.

R.C. 2151.353(A)(4).

{¶ 9} As an initial matter, we note that neither party requested findings of fact or conclusions of law as authorized by the foregoing provision. In any event, the trial court filed a judgment consisting of four single-spaced pages containing sufficient findings to enable appellate review. (Doc. #189). With regard to the finding required by R.C. 2151.414(E), the trial court determined that Father had "demonstrated a lack of

commitment towards T.S. by failing to regularly support, visit, or communicate with T.S. when he is able to do so." (Doc. #189 at 2). The trial court also determined that Father had abandoned T.S. (*Id.*). Under R.C. 2151.414(E), both of these findings by the trial court support a conclusion that T.S. cannot or should not be placed with Father within a reasonable time. *See* R.C. 2151.414(E). With regard to Mother, the trial court recognized that T.S. already had been adjudicated dependent three times while in Mother's care. (Doc. #189 at 2). This finding supports a conclusion that T.S. cannot or should not be placed with Mother within a reasonable time. *See* R.C. 2151.414(E)(16) (catch-all) and 2151.414(B)(1)(e) (stating that once three dependency findings have been made, the only relevant issue is the child's best interest). Finally, the trial court found elsewhere in its ruling that T.S. needs a legally secure permanent placement, which it opined "cannot be achieved without a grant of permanent custody" to GCCS. (Doc. #189 at 3). This specific finding by the trial court reasonably negates the possibility of any belief by the trial court that T.S. could or should be placed with either parent within a reasonable time.

{¶ 10} The real disputed issue (at least with regard to Father's lone assignment of error and Mother's first and third assignments of error) is the trial court's best-interest finding. In his assignment of error, Father cites the statutory best-interest factors and appears to challenge the trial court's analysis of them. (Father's appellate brief at 4-7). For her part, Mother argues in her first assignment of error that the trial court's disposition is against the manifest weight of the evidence because she effectively had satisfied her most recent case-plan objectives. (Mother's brief at 5-7). In her third assignment of error, Mother directly challenges the trial court's statutory best-interest findings. (*Id.* at 8-11).

{¶ 11} We turn initially to Mother's first assignment of error. Her argument is that

the trial court's decision is against the weight of the evidence because she had completed all of her case plan objectives except for a 12-week parenting class, which GCCS added to the plan six weeks before the final hearing. In particular, Mother argues that she had maintained safe and stable housing, she had offered to participate in counseling to address T.S.'s special needs, she had discontinued violent relationships, she had obtained assistance to deal with her finances, she had passed drug screens, she had arranged childcare, she had complied with mental-health treatment, and she had not allowed T.S. to be around unsafe individuals.

{¶ 12} Upon review, we find Mother's first assignment of error to be unpersuasive. We do not dispute that, by the time of the final hearing on T.S.'s third and most recent dependency complaint, Mother at least arguably had satisfied her case plan objectives, a fact recognized by the guardian ad litem. (Tr. Vol. III at 714-715). That fact, however, is not dispositive at the best-interest stage. *In re T.D.*, 2d Dist. Montgomery No. 27136, 2016-Ohio-7245, ¶ 12. " '[A] parent's case plan compliance, while it may be relevant to a best interest analysis, does not automatically override a trial court's decision regarding what is in a child's best interests.' " *Id.*, quoting *In re M .B.*, 4th Dist. Highland No. 15CA19, 2016-Ohio-793, ¶ 59, citing *In re N.L.*, 9th Dist. Summit No. 27784, 2015-Ohio-4165, ¶ 35. This court has recognized that "[w]hen the focus is on the child's best interest, a trial court conceivably could terminate parental rights even if a parent completed all of her case-plan objectives." *In re T.D.* at ¶ 12, citing *In re M.B.* This court also has observed that "[t]he case plan is simply 'a means to a goal, but not the goal itself,' and other considerations still may justify an award of permanent custody to a children-services agency." *Id.*, quoting *In re J.H.*, 12th Dist. Clinton Nos. CA2015-07-014, CA2015-07-015,

2016-Ohio-640, ¶ 47 (citations omitted); *see also In re R.P.*, 2d Dist. Montgomery Nos. 26744, 26754, 2015-Ohio-4295, ¶ 17 ("While Father and Mother admittedly made progress on their case plans, that fact is not dispositive of their child's best interest. The trial court is best positioned to weigh the various best-interest factors, and an award of permanent custody to the State can be appropriate even when just one of those factors supports such a disposition.").

{¶ 13} Because Mother's compliance with her most recent case-plan objectives is relevant to, but not dispositive of, the trial court's best-interest determination, we will proceed to Father's sole assignment of error and Mother's third assignment of error, which address the best-interest issue directly.

{¶ 14} The statutory best-interest factors include the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, * * * ;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1).

{¶ 15} In its ruling, the trial court addressed the best-interest factors as follows:

The Court has [reviewed] the relevant factors herein, including those as set forth in ORC 2151.414(D)(1)(a)-(e) and the Court finds the interrelationship of T.S. and her foster family in making its decision. T.S. and her foster family have developed a bond. T.S. and her foster family began living together in 2013 and continually since 2014. T.S. needs in her life legally secure permanent placement and that type of placement cannot be achieved without a grant of permanent custody. As such, GCCS has met the burden of its motion to terminate [Mother's] and [Father's] parental rights.

(Doc. #189 at 3).

{¶ 16} Although the trial court made few factual findings to support its conclusions, Mother and Father did not request findings of fact as they could have done pursuant to R.C. 2151.353(A)(4). Moreover, based on our review of the record, we conclude that it contains evidence upon which the trial court reasonably could have relied to find, clearly and convincingly, that awarding GCCS permanent custody was in T.S.'s best interest.

{¶ 17} In arguing to the contrary, Mother asserts that she now has stable housing, income, and a support system. She also points out that she took parenting classes and a domestic-violence class. She also has visited T.S. regularly. Mother further asserts that the trial court could have awarded GCCS temporary custody or could have placed the

child with an aunt, grandmother, or family friend. (Mother's appellate brief at 10-11). For his part, Father contends he and his extended family had substantial contact with T.S. before GCCS became involved in 2013. Father denies allegations that he was insensitive to T.S.'s diagnosed post-traumatic stress disorder. He also denies inappropriately disciplining her during overnight visits. He admits becoming angry and refusing to work with GCCS for a period of time after his unsupervised visits were suspended. He insists that he subsequently became part of the case plan, however, and "completed the tasks he was able to do." (Father's appellate brief at 5). Father also notes that he had supervised visits with T.S. in November and December 2015, before testing positive for an illegal substance, THC, and not visiting again. (*Id.*). Father additionally argues that the guardian ad litem's report contained inaccuracies concerning Mother. (*Id.* at 6). Finally, he suggests that the trial court should have placed T.S. with his sister.

{¶ 18} We find the foregoing arguments to be unpersuasive. As a preliminary matter, the trial court had no obligation to consider placing T.S. with a relative or family friend. *In re E.S.*, 2d Dist. Clark No. 2016-CA-36, 2017-Ohio-219, ¶ 59. Unlike biological parents, other relatives or friends seeking placement are not afforded special status or presumptive rights. *Id.* A trial court need not find a child's relative or family friend unsuitable before granting an agency permanent custody, and a court is not required to favor a relative or friend where an award of permanent custody serves the child's best interest. *Id.*, quoting *In re A.C.H.*, 4th Dist. Gallia No. 11CA2, 2011-Ohio-5595, ¶ 44.

{¶ 19} In any event, the trial court heard evidence about possibly placing T.S. with C.L., who has been Father's girlfriend since 2014. The record contains evidence that Father struck C.L. in the face outside a nightclub in July 2015 after she caught him with

another woman. (Tr. Vol. II at 183). The record also contains evidence that C.L. works a lot and that Father resides with her about half of the time. (Tr. Vol. I at 106-108). Part of her proposed child-care plan involved relying on her teen-aged daughter. (*Id.*). The record also contains evidence that C.L. did not understand and would not discuss T.S.'s special psychological needs. (*Id.* at 232-233). GCCS ultimately concluded that she would not be a good fit for the child. (*Id.* at 233-234). GCCS also considered two other placement options: a grandmother and an aunt. When she was under consideration, the grandmother's one-bedroom apartment was too small and her husband would not submit to required fingerprinting. (*Id.* at 236-237). Finally, the record contains evidence that the aunt exhibited hostility and uncooperativeness during the pendency of the proceedings and refused to provide updated information. (*Id.* at 238-242).

**{¶ 20}** With regard to Father, the record supports a conclusion that he lacks stability and other characteristics needed to provide T.S. with a legally-secure permanent placement. Father has four children in all, does not have custody of any of them, and has not paid his required child support. (*Id.* at 198; Tr. Vol. III at 527). The record contains evidence that he "hasn't been a stable figure in [T.S.'s life] and has only seen her sporadically since the case opened." (Tr. Vol. I at 267). On December 23, 2015, Father appeared for a supervised visit and tested positive for using illegal drugs. (Tr. Vol. I at 170-171). He subsequently never appeared for another visit. (*Id.*). Father also has an extensive criminal history that includes convictions for aggravated burglary, aggravated robbery, possession of cocaine and crack cocaine, and felony theft. (Tr. Vol. II at 193-196). In addition, he has convictions for resisting arrest and public intoxication as well as numerous convictions for driving under suspension. (Tr. Vol. III at 528, 532-533). His most

recent convictions appear to have been for felony possession of cocaine in January 2015 and public intoxication in July 2015. (State's Hearing Exhibits; Tr. Vol. III at 528). Father also admitted having been incarcerated while T.S.'s dependency case was pending below. (*Id.* at 552). Caseworker Ann Masters characterized him at the final hearing as "frequently incarcerated." (Tr. Vol. II at 196). At the time of the hearing, she had not been able to verify the stability of Father's housing. (*Id.* at 343-344). Father also lacks a driver's license and had obtained a job only a week before the final hearing. (*Id.* at 452-455).

{¶ 21} As for Mother, she gave birth to five children prior to T.S. and voluntarily relinquished or involuntarily lost custody of all of them. (*Id.* at 200; Tr. Vol. III at 684-688). Although she lacks Father's extensive criminal record, she was convicted of felonious assault in 2003. (*Id.* at 199). Caseworker Masters testified that Mother lacks the ability to manage her bills and personal affairs without assistance. (*Id.* at 208). According to Masters, Mother has a learning disability and becomes "anxious" and "overwhelmed" very easily. (*Id.* at 230). In general, Mother has a hard time recognizing T.S.'s needs because she is "busy focusing on daily tasks." (*Id.* at 231).

{¶ 22} The record reflects that GCCS initially became involved with Mother and T.S. in May 2013 after Father punched her in the face and choked her while exchanging the child. (Tr. Vol. III at 605-606; Tr. Vol. I at 143; Doc. #69 at Stipulated Facts). Following that incident, Mother moved into a domestic-violence shelter with T.S. (Tr. Vol. III at 605). While there, Mother exhibited "a pattern of aggressive behavior toward her daughter." (Tr. Vol. I at 134). Caseworker Masters testified: "[M]other was having a difficult time caring for [T.S.] on a daily basis. The police had been called to the Domestic Violence Prevention Center twice in regards to [Mother's] aggression towards [T.S.], and we were concerned

that we would have—or that [T.S.] would have no eyes on her when [Mother] left the shelter." (*Id*.). On that occasion, Mother signed an "agreement of care." (*Id*.). T.S. went into foster care until January 2014, when Mother convinced GCCS that she had the ability to care for the child. (*Id*. at 135-139). In particular, Mother obtained counseling and medication, obtained suitable housing, and demonstrated basic parenting skills. (*Id*.).

**{¶ 23}** Shortly after reuniting with T.S., however, Mother started becoming "overwhelmed" and sought respite care from the child's former foster parents to give herself a break from parenting. (*Id*. at 139-140). Within weeks, another dependency complaint was filed and GCCS obtained temporary custody of T.S., who returned to the same foster care. The agency became involved this time after a neighbor called the police and reported hearing "slapping sounds and screaming and crying from [T.S.] inside Mother's apartment." (*Id*. at 140). The resulting dependency adjudication was based on stipulated facts that included, among other things, the following:

> In foster care TS was observed yelling and slapping dolls in the face if they "didn't behave." It was reported the child had been having nightmares about Texas Chainsaws and Freddy and Jason. TS acted out cutting off limbs from the doll and told the foster parent she watched movies with her mom. It was also reported and witnessed by the caseworker that TS becomes visibly upset when she was preparing to visit her mother like shaking and crying. TS has told this CW several times "I'm scared" and "I'm scared to go" (to her mother's) on multiple occasions.
>
> Recently, the police were called to [Mother's] residence by someone who reported hearing TS being repeatedly slapped and yelled at, stating

that "I'm your mother" and "You will call me mommy." The report claims that a similar incident had been heard in the recent past, but was not reported. Later that same day, [Mother] was observed pulling and yanking on TS's hair (while braiding it) so hard that the child was crying in pain. When instructed to stop [Mother] refused and continued doing what she was doing.

     \* \* \* The reporter also indicated that TS was observed sitting in an overly sexual manner and using words like "sexy" to describe herself. [Mother] did not find this concerning. This concern has been previously discussed with [Mother] by the agency after it was reported that TS had referred to herself as sexy and stated she watched mommy and her "boyfriend" kissing on the bed.

(Doc. #69 at 2).

**{¶ 24}** Mother proceeded to work on a new case plan to address GCCS's multiple concerns. By March 2015, she had made sufficient progress and had "stabilized" to the point that GCCS agreed to return custody to her with protective supervision. (Tr. Vol. I at 154, 157-158). Mother was reunited with T.S. in April 2015. (*Id.* at 158). Although things initially went well, by July 2015 Mother had accrued a delinquent electric bill in excess of $1,100. (Tr. Vol. III at 619). Caseworker Masters testified that Mother's inability to pay her utility bill was a recurring problem throughout the agency's involvement in the case. (Tr. Vol. II at 209-211). On the occasion in July 2015, Mother wrote a bad check to pay the bill, and her utilities were disconnected when it bounced. (Tr. Vol. II at 211; 326; Tr. Vol. III at 618-620). As a result, she was evicted from her apartment. (*Id.*). Around that time,

Mother lost unspecified survivor benefits she had been receiving, further impairing her financial situation. (Tr. Vol. I at 159). Mother also began having trouble with her child-care provider, who reported Mother not supplying food for T.S. and not paying the child-care provider for her work. (*Id.* at 160). According to Masters, Mother admitted that she had started leaving the child with a grandfather who was a drug user. (*Id.* at 161-162). The record further reflects that Mother had lost her driver's license and needed $1,200 to get it back. (Tr. Vol. III at 646). Despite her lack of a license, she admitted driving with T.S. in the car. (*Id.* at 695).

{¶ 25} In July 2015, GCCS filed a third dependency complaint. (Doc. #129). Mother again began working on case-plan objectives. At some point, she moved in with her mother in law before obtaining the apartment where she resided at the time of the final hearing in January and February 2016. When the hearing commenced, Mother had been living in her most recent apartment for about four months. (Tr. Vol. III at 604-605). When caseworker Ann Masters visited the apartment, it "didn't have any furniture." (*Id.* at 676). At that time, T.S. already had been returned to her previous foster home because Mother had "agreed that she was struggling and that it was in [T.S.'s] best interest to come back into agency custody." (Tr. Vol. I at 162).

{¶ 26} Although the guardian ad litem opined at the final hearing that Mother essentially had completed her most recent case plan objectives, she added: "Well, working a case plan when you are accountable is one thing. But once you're turned loose, what's going to happen? * * * [W]hat happens when nobody's looking anymore?" (Tr. Vol. III at 711). Caseworker Masters expressed more specific concerns. She opined:

> [Mother] has been unable to stabilize her own personal life long

enough for her to care for a child. [Mother] has a pattern of behavior, and the way it works with [Mother] is she'll get stable and she's stable for a minute, and then something happens, her disability gets in the way and it's very hard for her to function and things start falling apart.

\* \* \*

I'm taking—we are asking for permanent custody because [Mother] doesn't have the ability to remain stable long enough to raise a child successfully.

(Tr. Vol. II at 322).

{¶ 27} By January and February 2016, when the final hearing took place, T.S. had been in foster care with the same family almost continuously since November 2013 (except for brief periods of time when the child had been returned to Mother). (Tr. Vol. I at 10). T.S.'s undesirable behaviors had decreased, and she enjoyed being around the foster parents' other children. (*Id.* at 10-11). She referred to them as her brothers and sisters and had a sibling-like relationship with them. (*Id.* at 12). T.S.'s foster mother expressed a desire for her family to adopt the child. (*Id.* at 24-27).

{¶ 28} Having reviewed the record, we see clear and convincing evidence to support the trial court's finding that awarding GCCS permanent custody of T.S. is in the child's best interest. Although both parents at times have made substantial progress on their case plans, T.S.'s interaction with relevant parties, including Mother, Father, and the foster parents, militates in favor of the trial court's decision. Although T.S. is of tender years and has expressed varying wishes, the record reveals that, if anything, she most often has expressed a desire to reside with her foster parents. T.S.'s custodial history

also weighs in favor of awarding GCCS permanent custody. Finally, T.S.'s need for a legally secure permanent placement and the prolonged inability of Mother or Father to provide such an environment support the trial court's decision. As set forth more fully above, T.S., who turned six years old during the pendency of the proceedings below, already has been adjudicated dependent three times and has spent approximately two years in the care of a foster family where she is happy and doing well. An award of permanent custody will enable that family to provide the legally secure permanent placement that T.S. needs. For all of the foregoing reasons, we overrule Mother's first and third assignments of error and Father's sole assignment of error.

{¶ 29} In her second assignment of error, Mother contends the trial court erred in not addressing whether GCCS had made reasonable efforts to "reunify the family." More specifically, Mother argues that the trial court failed to consider whether the agency made reasonable efforts to reunify her with T.S. Absent a reasonable-efforts finding, Mother argues that the trial court was not authorized to grant permanent custody to GCCS. In connection with her argument, Mother also asserts that GCCS could have placed T.S. with a suitable relative rather than seeking permanent custody.[1] (Mother's appellate brief at 7-8).

{¶ 30} Upon review, we find Mother's second assignment of error to be unpersuasive. In support of her reasonable-efforts argument, Mother relies on R.C. 2151.419(A)(1), which provides:

(A)(1) *Except as provided in division (A)(2) of this section, at any*

---

[1] We fully addressed the issue of T.S.'s placement with a suitable relative above and need not repeat that analysis here.

*hearing held pursuant to section 2151.28, division (E) of section 2151.31, or section 2151.314, 2151.33, or 2151.353 of the Revised Code* at which the court removes a child from the child's home or continues the removal of a child from the child's home, the court shall determine whether the public children services agency or private child placing agency that filed the complaint in the case, removed the child from home, has custody of the child, or will be given custody of the child has made reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home. * * *

(Emphasis added).

{¶ 31} As explained above, "[t]here are two avenues by which an agency can obtain permanent custody of a child: (1) by requesting it in the abuse, neglect or dependency complaint under R.C. 2151.353 or (2) by filing a motion under R.C. 2151.413 after obtaining temporary custody." *In re S.B.*, 2009-Ohio-2290, at ¶ 7. When an agency pursues the second method by filing a permanent-custody motion under R.C. 2151.413 after obtaining temporary custody, the reasonable-efforts statute, R.C. 2151.419(A)(1), does not directly apply. *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 41-43. But when an agency pursues the first method by requesting permanent custody in its complaint under R.C. 2151.353, the reasonable-efforts requirement ordinarily does apply. *In re S.B.* at ¶ 7, citing R.C. 2151.419(A)(1).

{¶ 32} Here GCCS previously had obtained temporary custody of T.S. But the child had been returned to Mother before the agency became involved again. GCCS's most

recent activity involved filing a third dependency complaint and requesting permanent custody therein. (Doc. #129). Therefore, a reasonable-efforts finding ordinarily would be required. The reasonable-efforts statute contains exceptions, however, negating the need for such a finding. In relevant part, R.C. 2151.419(A)(2) states:

(2) If any of the following apply, the court shall make a determination that the agency is not required to make reasonable efforts to prevent the removal of the child from the child's home, eliminate the continued removal of the child from the child's home, and return the child to the child's home:

* * *

(e) The parent from whom the child was removed has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to section 2151.353, 2151.414, or 2151.415 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to those sections.

{¶ 33} In the present case, the trial court recognized the existence of the reasonable-efforts issue. It determined, however, that GCCS was not required to make the reasonable efforts discussed above because the facts fit within one of the exceptions in R.C. 2151.419(A)(2). (Doc. #189 at 4). Although the trial court did not specify the applicable exception, it potentially may have relied on R.C. 2151.419(A)(2)(e) based on the involuntary termination of mother's parental rights with respect to one of T.S.'s siblings. In any event, Mother's appellate brief fails to mention, much less challenge, this aspect of the trial court's ruling.[2] As a result, she has not demonstrated error in the trial

---

[2] The record reflects that Mother did not have custody of any of her six children. At least

court's decision. We note too that the trial court repeatedly made "reasonable efforts" findings in this case, which commenced in 2013. The last of those findings appears to have been made as recently as August 2015 when the trial court granted GCCS interim custody after the agency's third dependency complaint. Under these circumstances, we would find harmless error even if the trial court were required to include a reasonable-efforts finding in its permanent-custody decision. The record illustrates, and the trial court repeatedly found, that GCCS did make reasonable efforts to avoid removing T.S. from Mother's care and to return the child there. *See, e.g.*, *In re C.B.C.*, 4th Dist. Lawrence Nos. 15CA18, 15CA19, 2016-Ohio-916, ¶ 78 (noting that a trial court's failure to make a "reasonable efforts" finding can constitute harmless error under appropriate circumstances); *In re Pittman*, 9th Dist. Summit No. 20894, 2002-Ohio-2208, ¶ 15 (finding at most harmless error in trial court's determination that agency was not required to make "reasonable efforts" to reunify parent and child, in termination of parental rights proceeding, where the trial court already had made several "reasonable efforts" findings earlier in the case). Accordingly, Mother's second assignment of error is overruled.

{¶ 34} In her fourth assignment of error, Mother contends the trial court erred in "not discounting" the guardian ad litem's recommendation and in not appointing separate counsel for T.S.

{¶ 35} With regard to the first issue, Mother argues that the guardian ad litem, who recommended permanent custody to GCCS, contravened Sup.R. 48(D)(13) by failing to make reasonable efforts to become informed about the facts and to contact all parties.

one of those children had been "taken" from Mother by a children services agency and placed in foster care until reaching age 18. (Tr. Vol. II at 202-203; Tr. Vol. III at 684-685).

While acknowledging that the rule lacks the "force of law," she maintains that the trial court still should have rejected the guardian ad litem's report and opinions because the guardian's conduct fell far below the standards found in Sup.R. 48(D)(13). With regard to the appointment of counsel, Mother asserts that separate counsel was required for T.S. because the child's custody wishes conflicted with the guardian's.

{¶ 36} We find neither of Mother's arguments to be persuasive. This court previously addressed Sup.R. 48(D)(13) and characterized it as "an administrative directive" that creates no individual rights and lacks the force of law. *Corey v. Corey*, 2d Dist. Greene No. 2013-CA-73, 2014-Ohio-3258, ¶ 9. A trial court has discretion to consider a guardian's opinion and report even when the guardian does not comply with the directives found in Sup.R. 48(D)(13).

{¶ 37} Here we find no abuse of discretion in the trial court's consideration of the guardian's recommendation. In her appellate brief, Mother identifies a litany of things that she believes the guardian either failed to do or failed to do sufficiently. (Mother's appellate brief at 13). We note, however, that the guardian was examined at length regarding those perceived deficiencies and what she did, or did not do, in this case. (Tr. Vol. III at 701-746). We note too that much of the guardian's hearing testimony was favorable to Mother. Among other things, the guardian acknowledged that Mother effectively had completed her most recent case-plan objectives and had done everything GCCS had asked her to do. The guardian also acknowledged that some of GCCS's information about the case appeared to be inaccurate or incomplete. (Tr. Vol. III at 701-718). On the record before us, we are unconvinced that the trial court abused its discretion in considering the guardian's hearing testimony and written report notwithstanding the perceived

deficiencies cited by Mother.

{¶ 38} We are equally unpersuaded by Mother's argument about the appointment of separate counsel for T.S. The basis for Mother's argument is that the child's wishes regarding permanent custody differed from the guardian's. Under such circumstances, Mother contends the appointment of separate counsel to assist T.S. was required. We disagree that separate counsel was required here.

{¶ 39} Separate counsel must be appointed to represent a child in permanent-custody cases only when the child consistently has expressed a desire that is inconsistent with the guardian's recommendation and when the child is mature enough to understand the situation. *See*, *e.g.*, *In re J.W.*, 2d Dist. Clark Nos. 2013-CA-113, 2013-CA-114, 2014-Ohio-2814, ¶ 38-48. In the present case, T.S. was four years old when GCCS initially became involved with her. She turned six years old during the pendency of the proceedings. At different times, T.S. expressed a desire to live with her foster parents. The child also once expressed a desire to live with Mother, but without the "scary boyfriends." Under these circumstances, the trial court did not err in failing to appoint separate counsel for T.S. Mother's fourth assignment of error is overruled.

{¶ 40} In her fifth assignment of error, Mother asserts that the trial court erred in not adequately considering T.S.'s wishes and in not appointing separate counsel to help the child adjudicate those wishes.

{¶ 41} Insofar as this assignment of error references the non-appointment of separate counsel, we resolved that issue above. With regard to the trial court's consideration of T.S.'s wishes, we see no error. Mother's entire substantive argument is as follows:

In the instant matter, the trial court failed to consider the wishes of the child. The CASA/guardian ad litem did not list the wishes of the child in her report. The child was never interviewed by the court, nor did the child have counsel who could advocate the child's position. Therefore, the trial court committed reversible error. Mother respectfully requests that this Court find the same.

(Mother's appellate brief at 14).

**{¶ 42}** Contrary to Mother's argument, the guardian ad litem filed multiple reports addressing T.S.'s wishes. The guardian ad litem also testified about the child's wishes at the permanent-custody hearing. In its ruling, the trial court stated that it had considered the factors set forth in R.C. 2151.414(D)(1)(a)-(e). (Doc. #189 at 3). Notably, those factors include "[t]he wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child." R.C. 2151.414(D)(1)(b). Because the foregoing provision authorized the trial court to ascertain the child's wishes through the guardian ad litem, the trial court was not required to interview the child. Although the trial court did not explicitly discuss the child's wishes in its ruling, the record reflects that it possessed and considered information about those wishes, which were inconsistent in any event. For the foregoing reasons, Mother's fifth assignment of error is overruled.

**{¶ 43}** Having overruled all assignments of error raised by Mother and Father, we affirm the judgment of the Greene County Common Pleas Court, Juvenile Division.

. . . . . . . . . . . . .

FROELICH, J., and WELBAUM, J., concur.


Copies mailed to:

Stephen K. Haller
Nathaniel R. Luken
Hilary Lerman
Marcy A. Vonderwell
Hon. Adolfo A. Tornichio