[Cite as *In re D.F.*, 2022-Ohio-1781.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

IN RE: D.F. & A.W.F.

:
:
:          Appellate Case No. 29350
:
:          Trial Court Case Nos. G-2018-000278-
:          0N, 0Q and H-2018-000279-0P, 0R
:
:          (Appeal from Common Pleas Court-
:          Juvenile Division)
:

. . . . . . . . . . .

O P I N I O N

Rendered on the 27th day of May, 2022.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by LISA M. LIGHT, Atty. Reg. No. 0097348, Assistant
Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division,
Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
          Attorney for Appellee, Montgomery County Children Services

ROBERT ALAN BRENNER, Atty. Reg. No. 0067714, P.O. Box 340214, Dayton, Ohio
45434
          Attorney for Appellant, Mother

. . . . . . . . . . . .

TUCKER, P.J.

**{¶ 1}** Mother appeals from a judgment of the Montgomery County Court of Common Pleas, Juvenile Division, which terminated her parental rights and awarded Montgomery County Children Services ("MCCS") permanent custody of her children, D.F. and A.W.F. Mother contends the juvenile court erred by finding that an award of permanent custody was in the children's best interest.

**{¶ 2}** Because the record clearly and convincingly establishes that the children had been in the temporary custody of MCCS for 12 or more months out of a consecutive 22-month period and that an award of permanent custody to MCCS was in the children's best interest, we affirm.

## I. Facts and Procedural History

**{¶ 3}** D.F. was born in December 2006 and A.W.F. was born in May 2009. Both boys lived with Mother for the majority of their lives. Father has not been involved with the children and has not participated in this case.

**{¶ 4}** A.W.F. has been diagnosed with numerous disorders including autism, attention deficit hyperactivity disorder, Tourette's syndrome, and intermittent explosive disorder. He takes five different medications for the management of his conditions. D.F. has been diagnosed with disruptive mood dysregulation, attention deficit hyperactivity combined presentation, and developmental coordination disorder. He takes three different medications for his conditions. Mother receives treatment for post-traumatic stress disorder, anxiety, and depression, and has been prescribed three

medications.

{¶ 5} MCCS has been involved with this family since early 2017 when D.F. and A.W.F. were discovered home alone while Mother was at work. When police responded to the home, they noted a foul odor in the residence. The entire home was in disarray with dog feces throughout. The officers discovered raw, spoiled meat on the kitchen floor and expired food in the refrigerator. They also noted moldy dishes piled in the kitchen. Mother was arrested and convicted of misdemeanor child endangering. The children were placed outside the home but were subsequently returned to Mother's care.

{¶ 6} In January 2018, staff at D.F.'s school noted he was arriving at school in dirty clothes with an obvious odor about him. The school resource officer, Thomas Hamlin, was alerted, and a welfare check was conducted on January 18, 2018. When Hamlin arrived at the home, he noted numerous dogs running in the house. Hamlin observed and smelled dog feces throughout the home. He also observed that the only toilet in the home was clogged with feces. Hamlin found that there was no edible food in the home and that there was standing water in both the kitchen sink and bathtub. The house was cluttered with debris, and trash was strewn about the home. None of the beds had sheets or blankets.

{¶ 7} A.W.F. and D.F. were removed from the home. Mother was arrested and charged with felony child endangering. Mother was ultimately convicted as charged. On January 19, 2018, MCCS filed a complaint alleging that D.F. and A.W.F. were abused, neglected and dependent. The children were placed in the emergency custody of MCCS that day. On February 23, 2018, the juvenile court adjudicated the children to be

neglected, abused and dependent, and MCCS was granted temporary custody.

{¶ 8} A case plan was implemented for Mother. The case plan objectives included the following: (1) complete a mental health assessment and follow any recommendations; (2) complete of a parenting psychological assessment and follow any recommendations; (3) complete a parenting education course and demonstrate improvement in parenting skills; (4) maintain the home to a minimally acceptable standard; (5) work with a financial planner in order to address a pending foreclosure action; (6) attend appointments with the children; (7) participate in monthly caseworker visits; (8) attend weekly visitation with the children; and, (9) sign information release forms.

{¶ 9} In December 2018, MCCS referred Mother to Agape for Youth, Inc. ("Agape"), an entity which provides assistance to families in the reunification effort. Agape personnel work directly with families for approximately five to ten hours per week. The case was assigned to Donna Merrill, who first met with Mother on December 4, 2018. Merrill noted that Mother's house was cluttered and had a strong odor of urine. Merrill's primary focus was on getting the home clean and making it safe for the children while also providing Mother with skills to help her deal with the behavioral needs of the boys.

{¶ 10} During a visit to the home in early January 2019, Merrill noted that the home was "uncomfortably cold" and had an "overwhelming" odor of urine. Tr. p. 147. Merrill also observed that the house was cluttered with trash and had dried feces on the floor. The boys' mattresses were on the floor with no sheets or blankets. The kitchen was cluttered with old food and dirty dishes.

{¶ 11} During January and February 2019, Mother made progress with the home, and her visitations with the children went well. MCCS decided to allow unsupervised visits and also began to allow overnight visits in the home. The overnight visits were restricted to one child at a time. In March 2019, MCCS arranged for extended visitation during the children's spring break vacation; both boys were placed in Mother's home for that week. However, by the end of the week, the situation had deteriorated. Merrill found the house to be in "probably the worst [condition] I'd ever seen it." Tr. p. 157. Mother told Merrill that the boys were out of control and were cursing at her, hitting her, and throwing objects around. According to Mother, the boys had also been hitting and kicking each other and A.W.F. had been urinating on the floor. Merrill observed broken glass, cereal boxes, and spilled drinks on the floors throughout the home. Mother stated that she had been unable to maintain the house and take care of the children at the same time. However, Mother also admitted that she had not attempted to control the boys' behavior because she believed they were having a good time.

{¶ 12} After the spring break visit ended, A.W.F. made an allegation that D.F. had sexually assaulted him during the visit. Following an investigation, it could not be determined whether an assault had occurred. However, MCCS restricted visitations between the children to supervised visits. MCCS paused its reunification effort due to Mother's inability to maintain the home in a minimally acceptable standard and her inability to effectively supervise the children. At that point, Agape closed its case, and Merrill had a final home meeting with Mother.

{¶ 13} Eventually, Mother again began working toward cleaning the home. Once

the condition of the home improved, MCCS attempted to reunify Mother and D.F., based upon the theory that D.F. would be easier to care for while maintaining the home. This attempt involved D.F. being returned to the home in June 2019 for an extended visitation. MCCS conducted multiple home visits per month while D.F. lived there and noted that the condition of the home was "marginal, but okay." Tr. p. 318. However, by the end of September 2019, the urine smell began increasing, and the home was again cluttered with trash. In October, the caseworker began receiving telephone calls from D.F.'s school regarding his lack of personal hygiene. The school also reported that D.F. was wearing ill-fitting clothing, was not prepared for his classes, and was demonstrating escalating inappropriate conduct, including threatening other students and lashing out at the staff. After speaking with the school therapist, the caseworker requested a home welfare check. Police officers went to the home, but Mother did not permit them to enter. The next day, Hamlin, the school resource officer, accompanied two caseworkers to the home. Mother permitted them to enter but had the lights turned off and the curtains closed; eventually, the lights were turned on, and the caseworkers and Hamlin were able to observe animal feces throughout the home. They also observed moldy food in the kitchen and a puddle of urine in the dining room. A cat litter box in the kitchen was full of feces, and feces was splattered on the floor. There were dried feces marks on a wall that Mother said had been there for two years. D.F. was removed from the home that day. On January 3, 2020, MCCS filed a motion seeking permanent custody of the children.

{¶ 14} During the pendency of this case, D.F. has been in the same foster home

except during the periods of extended visitation with Mother. His foster family was meeting his physical and mental needs and had expressed interest in adoption, but it was concerned by Mother's interference with D.F.'s care.

{¶ 15} A.W.F.'s behavioral problems and mental health symptoms deteriorated as he got older. He exhibited inappropriate sexual behavior, which had escalated to the point that he had attempted to masturbate in front of other people. He had been violent toward his peers and made comments about raping little girls and setting people on fire. He hoarded and consumed his own feces.[1]

{¶ 16} A.W.F. had had five foster home care placements. At one point, he was in a foster home in which MCCS had previously placed some of its most challenging children. However, in September 2018, A.W.F.'s behavior escalated to the point that he was hospitalized for ten days in the psychiatric ward of Cincinnati Children's Hospital for psychosis and hallucinations. A.W.F. was then removed from that foster placement; the foster parents did not believe they could safely house A.W.F. because he had acted violently toward the other children in the home.

{¶ 17} In May 2019, A.W.F. was placed in a group home in Montgomery County, where he has remained. At one point, the group home contemplated making a removal request because the staff members did not believe they could care for A.W.F. and because Mother was combative with the staff. Thereafter, MCCS limited Mother's contact with A.W.F., and his behavior somewhat improved. The home hired additional

---

[1] According to the caseworker, Mother stated that A.W.F. had had a habit of consuming his own feces since he was two-years old. The caseworker stated Mother did not find this behavior concerning.

staff in order to care for A.W.F., and he received 24-hour personalized care at the time of the hearing. Except when he is sleeping, A.W.F. was given one-on-one care.

{¶ 18} A hearing on the motion for permanent custody was conducted on November 12 and 13, 2020. Thereafter, the magistrate found that the children had been in the custody of MCCS for 12 out of 22 consecutive months and that a grant of permanent custody to MCCS was in the best interest of the children. Mother filed timely objections to the magistrate's decision. On December 8, 2021, the trial court overruled Mother's objections and awarded permanent custody of both children to MCCS.

{¶ 19} Mother appeals.

## II.

{¶ 20} Mother asserts the following as her sole assignment of error:

THE JUVENILE COURT ERRED WHEN IT GRANTED PERMANENT CUSTODY OF THE CHILDREN TO [MCCS].

{¶ 21} Ohio recognizes that "parents who are 'suitable' have a 'paramount' right to the custody of their children." *In re B.C.*, 141 Ohio St.3d 55, 2014-Ohio-4558, 21 N.E.3d 308, ¶ 19, quoting *In re Perales*, 52 Ohio St.2d 89, 97, 369 N.E.2d 1047 (1977). (Other citations omitted.) However, the rights of the parent "are not absolute, but are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.' " *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979), quoting *In re R.J.C.*, 300 So.2d 54, 58 (Fla. App.1974). "Ultimately, parental interests are subordinate to the child's interest when determining the appropriate resolution of a

petition to terminate parental rights." *B.C.* at ¶ 20.

{¶ 22} Ohio's statutes regarding termination of parental rights recognize the importance of determining the best interest of a child. R.C. 2151.414(B)(1) establishes a two-part test for courts to apply when determining a motion for permanent custody. Relevant to this case, the statute requires a court to find, by clear and convincing evidence, that: (1) the child has been in the temporary custody of a public children services agency for 12 or more months of a consecutive 22-month period; and (2) a grant of permanent custody is in the child's best interest. "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

{¶ 23} Here the juvenile court made the findings required to award MCCS permanent custody. Specifically, the court found the children had been in the custody of MCCS for 12 or more months of a consecutive 22-month period and that awarding permanent custody to MCCS was in their best interest. We review the court's decision for an abuse of discretion, and we will not disturb custody decisions on evidentiary grounds "if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established." *In re T.D.*, 2d Dist. Montgomery No. 27136, 2016-Ohio-7245, ¶ 5, citing *In re L.C.*, 2d Dist. Clark No. 2010-CA-90, 2011-

Ohio-2066, ¶ 14. The phrase "abuse of discretion" implies a decision that is unreasonable, arbitrary, or unconscionable. *Id.*

**{¶ 24}** Mother does not dispute that the children had been in the temporary custody of MCCS for 12 or more months of a consecutive 22-month period. Instead, she asserts that the evidence did not support the finding that awarding permanent custody to MCCS was in the best interest of the children. Her argument in support focuses exclusively on the assertion that she has met her case plan goals.

**{¶ 25}** The record shows that Mother had worked on her case plan. Indeed, she had completed several of the case plan goals. However, some of the goals had not been met. For example, the record demonstrates that Mother completed a mental health assessment and attended therapy at the Flexman Clinic. However, she quit attending therapy in February 2019. When confronted about the lack of ongoing services, Mother claimed that she was completing therapy through another service, but she did not provide documentation to verify these services. Approximately a year later, in April 2020, MCCS received a letter from a counseling service indicating that Mother was engaged in therapy for anxiety. This record supports a finding that Mother had been somewhat compliant with the mental health component of her case plan. However, it also shows that she did not resume counseling services until MCCS filed for permanent custody.

**{¶ 26}** Mother also completed a parenting assessment and attended parenting classes through different services including MCCS, Agape, and United Rehabilitation Services. However, both the caseworker and Merrill, the Agape employee, testified that Mother would initially show some improvement after the classes, but she would not

continue to implement what she had learned. Mother failed to intervene with the children when they were violent with each other and would claim they were merely play-fighting. Mother continued to allow A.W.F. to eat with his hands, stating he did not know how to use utensils.[2] She expressed no concern about the allegations of sexual assault and showed no concern about having the boys together. During one visit, A.W.F. was injured when he began to climb up a wall without any intervention by Mother. Mother minimized the severity of A.W.F.'s condition and believed she could handle him on her own. However, the child ran away from Mother's home in December 2018 and January 2019. During one overnight visit, A.W.F. defecated in different places around the home and urinated on Mother's bed. A.W.F. was violent toward both Mother and D.F. The record was replete with instances demonstrating that Mother basically allowed the boys to run amok without any attempt to moderate their behavior, even when that behavior was unsafe and violent. Further, Mother expressly stated that she was unable to maintain a clean, safe home and simultaneously care for the boys. Thus, while Mother complied with the case plan by attending parenting classes, she was unable to implement the lessons.

{¶ 27} Additionally, MCCS provided services through Agape in order to help Mother learn to maintain her home while caring for the children. However, the record amply demonstrates that Mother consistently failed to maintain the home in a manner suitable and safe for raising children. Even after extensive services were provided, she informed MCCS that she could not maintain the home while simultaneously caring for the

---

[2] When Merrill visited A.W.F. in one of his foster homes, she observed him sit at the table and use utensils to eat.

boys. Further, it appears that Mother would allow the home to fall into disarray every time the children were returned to her and would only work on house maintenance when MCCS removed the children. This pattern had been ongoing since 2017.

**{¶ 28}** Based upon this record, we cannot conclude Mother had substantially complied with portions of her case plan. Furthermore, even had Mother successfully complied with every requirement of her case plan, this court has stated that completion of a case plan is not dispositive of a best interest analysis. *In re T.D.*, 2d Dist. Montgomery No. 27136, 2016-Ohio-7245, ¶ 12. *Accord In re C.C.*, 187 Ohio App.3d 365, 2010-Ohio-780, 932 N.E.2d 360, ¶ 25 (8th Dist.). "When the focus is on the child's best interest, a trial court conceivably could terminate parental rights even if a parent completed all of her case-plan objectives." (Citation omitted.) *T.D.* at ¶ 12, citing *In re M.B.*, 4th Dist. Highland No. 15CA19, 2016-Ohio-793, ¶ 59. Case plans are "simply 'a means to a goal, but not the goal itself,' and other considerations still may justify an award of permanent custody to a children-services agency." (Citations omitted.) *Id.*, quoting *In re J.H.*, 12th Dist. Clinton No. CA2015-07-014, 2016-Ohio-640, ¶ 47.

**{¶ 29}** In determining the best interest of a child, R.C. 2151.414(D) requires a juvenile court to consider the following factors: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child; (4) the child's need for a legally secure permanent placement and whether that type of placement can

be achieved without a grant of permanent custody to the agency; and (5) whether any factors listed under R.C. 2151.414(E)(7) to (11) apply.

{¶ 30} With regard to the interaction and interrelationship of the children to significant others, we note there is no dispute that Mother loves the children and that the boys are bonded with her. However, the boys are not bonded with one another. D.F. expressed resentment that his Mother expects him to help care for A.W.F., and he had no interest in being with A.W.F.

{¶ 31} D.F. was in a foster-to-adopt placement. There was evidence that he had bonded with his foster family and enjoyed his time in their home. He stated that he was allowed to be just a kid in the foster home rather than being expected to take care of a sibling. He also had expressed that he was not embarrassed about the condition of his foster home like he was about Mother's home.

{¶ 32} A.W.F.'s therapist stated it would be a challenge for A.W.F. to have a meaningful relationship with anyone due to his disabilities. However, he received appropriate care and supervision in the group home.

{¶ 33} Both boys had expressed the desire to return to Mother. However, D.F. did not want A.W.F. in the home. The guardian ad litem recommended an award of permanent custody to MCCS.

{¶ 34} The trial court found that both children were in need of a legally secure placement, which could not be achieved without a grant of permanent custody to MCCS. The boys had been in the temporary custody of MCCS since in January 2018. MCCS attempted reunification of Mother with both children, but the condition of the home

deteriorated and Mother was not able to maintain a safe environment or adequately care for the boys. MCCS attempted a second reunification with D.F. only, but D.F. started appearing in school with hygiene and behavioral issues, and the home was found to be in a substandard condition. Mother had two convictions for child endangering, and there was no evidence to support a finding that she had overcome the issues that led to those convictions. Further, both boys had special needs which Mother had been unable to meet. D.F.'s needs were being met in his foster home, which was a foster-to-adopt placement. The record demonstrates that A.W.F. needed to reside in a secure facility where he had multiple caregivers.

{¶ 35} On this record, the juvenile court did not err in terminating Mother's parental rights and awarding permanent custody to MCCS; there was clear and convincing evidence that the children had been in the temporary custody of MCCS for more than 12 months of a 22-month period. Further, the evidence supported the court's finding that an award of permanent custody was in the children's best interest.

{¶ 36} The sole assignment of error is overruled.

### III. Conclusion

{¶ 37} The judgment of the juvenile court is affirmed.

. . . . . . . . . . . . .

DONOVAN, J. and WELBAUM, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Lisa M. Light
Robert Alan Brenner
Michael P. Brush
Carl A. Lux
J.S.
Hon. Helen C. Wallace